**OXFORD HOUSE, INC., and John Does One through Seven (Prospective Residents of 911 South King's Highway), Plaintiffs,**

v.

**TOWNSHIP OF CHERRY HILL, Defendant.**

**Civ. No. 92–1150.**

United States District Court,
D. New Jersey.

Sept. 10, 1992.

James Katz, American Civil Liberties Union of New Jersey, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., for plaintiffs.

Francine I. Axelrad, Mun. Atty., Cherry Hill, N.J., for defendant.

## OPINION

GERRY, Chief Judge.

Plaintiffs are a group home for recovering drug addicts and alcoholics and its residents. They seek a preliminary injunction from this court preventing the Township of Cherry Hill from interfering with their rental and occupancy of a house located in a single family residential zone in Cherry Hill. The complaint and an application for a temporary restraining order were filed on March 20, 1992, after the Township refused to issue plaintiffs a Certificate of Occupancy ("C.O.") on the grounds that they failed to meet the definition of a "single family" under the Township's zoning ordinance. Without this C.O., plaintiffs were prohibited under the zoning ordinance from occupying the house. The complaint charges that Cherry Hill's action constitutes discrimination on the basis of handicap in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.* On the day the suit was filed, this court issued a temporary restraining order, enjoining the Township from interfering with the immediate occupancy of the house by plaintiffs. A preliminary injunction hearing was subsequently held on May 14, 1992. Based on the following findings of fact and conclusions of law, plaintiffs' request for a preliminary injunction will be granted.

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff, Oxford House, Inc., is a Maryland, not-for-profit, tax-exempt corporation which assists in the establishment of housing for recovering alcoholics and substance abusers. Oxford House, Inc. serves as the umbrella organization for a national network of approximately 400 individual Oxford Houses, approximately 20 of which are located in New Jersey.

2. Plaintiffs, John Does One through Seven, are current residents of a newly-established Oxford House located at 911 South Kings Highway in Cherry Hill, New Jersey. They are all recovering alcoholics and substance abusers in need of housing, and they each have completed a rehabilitation program for either alcoholism or drug abuse prior to moving into the house.

3. Defendant, Township of Cherry Hill, is a municipal corporation located in Camden County, New Jersey, organized under the laws of the State of New Jersey. Cherry Hill exercises zoning authority over the land within its borders.

4. Oxford Houses are not health care facilities, rehabilitation centers, or supervised halfway houses. They are simply residential dwellings rented by a group of individuals who are recovering from alcoholism and drug addiction. Three basic rules govern the functioning of all Oxford Houses: each house must 1) be democratically self-governed by its residents, 2) be financially self-supporting, and 3) immediately expel any resident who relapses into drug and/or alcohol use. No professional treatment, therapy, or paid staff is provided. Unlike a boarding house, where a proprietor is responsible to run and operate the premises, at Oxford House, the residents are responsible for their own food and care as well as for running the home. Because the house must be self-supporting, each of the residents needs a source of income to pay his or her fair share of the expenses.[1]

---

**1.** The original Oxford House was founded in 1975 in Montgomery County, Maryland by a group of individuals who were recovering from alcohol or drug addiction. When the County decided to close the halfway house in which they had been living because of lack of funds, the group rented the house themselves. Resentful of the way the halfway house had been run, they sought to operate Oxford House differently: no staff was present at the house; a resident could stay as long as he worked, remained drug and alcohol free, and paid his share of the

5. Oxford House, Inc. has entered into a contract with the State of New Jersey to administer a revolving loan fund, which makes start-up loans to help establish group homes for recovering alcoholics and substance abusers throughout the state. New Jersey set up this loan fund in accordance with the federal Anti–Drug Abuse Act of 1988, 42 U.S.C. § 300x–4a, under which states are required to initiate such loan funds in order to receive federal block grant funds for alcohol and drug abuse and mental health services under the Public Health Services Act, 42 U.S.C. §§ 300x and 300x–2. Under the Anti–Drug Abuse Act, groups of four or more recovering alcoholics or substance abusers who want to live in a group home are entitled to a loan of up to $4,000 to cover the start-up expenses of renting a house, including the security deposit and first month's rent. The loan must be repaid within two years. In order to be eligible for the funds, the houses must operate according to the basic Oxford House model; i.e., they must: 1) be democratically self-governing; 2) be financially self-supporting; and 3) prohibit the use of illegal drugs or alcohol on the premises and immediately expel any resident who resumes the use of drugs or alcohol.[2] *See* 42 U.S.C. § 300x–4a(a)(6).

6. Although Oxford House, Inc. provides assistance in setting up individual houses and provides technical support initially, once established, an individual Oxford House is no longer subject to direct, ongoing control by Oxford House, Inc. The residents of the house make all of the decisions regarding the management of the house, including decisions concerning new residents. This helps the residents to develop a sense of responsibility and self-esteem, which are important ingredients to a successful recovery.

7. Oxford House, Inc. attempts to locate houses in clean, drug-free, single family neighborhoods that will provide the occupants a sense of pride and self-worth. Oxford House, Inc. has found that the location of these houses in such neighborhoods plays a crucial role in an individual's recovery by promoting self-esteem, helping to create an incentive not to relapse, and avoiding the temptations that the presence of drug trafficking can create.

8. There is no limit on the amount of time an individual may reside in an Oxford House; as long as she does not resume the use of drugs or alcohol, meets the requisite financial obligations and does not engage in disruptive behavior, an individual could reside in an Oxford House indefinitely. At one of the original Oxford Houses, a resident stayed for 16 years. Most stay for shorter periods of time, however. In another Oxford House in Cherry Hill, which has been operating for two years, the average length of stay of the current residents has been six months to a year.

B. *The Dispute*

9. Early this year, Oxford House, Inc. made a decision to open up another house in Cherry Hill because the existing houses in Camden County were unable to meet the demand for suitable housing for recovering alcoholics and substance abusers in the area. Accordingly, in February of 1992, pursuant to Oxford House, Inc.'s contractual obligation with the State of New Jersey, it entered into a lease with a property management firm, Realco Management Inc., to rent the premises at 911 South Kings Highway for use as an Oxford House. In connection with this lease, a check in the amount of $2,875.00 was drawn from the New Jersey revolving loan fund and paid to Realco on March 5, 1992 to cover the first month's rent and security deposit. Oxford House, Inc. intended to have the house occupied beginning on March 15, 1992.

10. 911 South Kings Highway is a detached single family house located in a single family residential zone under the

expenses; and the house was democratically self-governed.

**2.** These provisions of the federal law are based upon the national experience of Oxford House, which served as a model for the "self-run and self-supported recovery housing envisioned by Congress." 134 Cong.Rec. E 3732 (Daily Ed. Nov. 10, 1988) (Remarks of Rep. Madigan).

Township's zoning ordinance. The property is located on a well-traveled street. Across the street from the house are a commercial office, two apartment complexes, a florist, and several offices in residential properties. On the same side of the street as the house are an office complex, a contractor who works out of his home, and residences mixed in with offices in residence-type buildings. Behind the house are another set of offices, as well as single family residences and duplexes.

11. Subsequent to entering into the lease with Oxford House, Realco applied to the Township for a Certificate of Occupancy pursuant to Township Ordinance 75–11, which requires a landlord to obtain a C.O. prior to any rental, including the rental of a single family home.[3] In order for a C.O. to be issued, the proposed use of the property must comply with the Township's zoning ordinance, as well as the Township's property maintenance code.

12. On March 11, 1992, Bernard Rosen, an inspector from Cherry Hill, inspected the premises pursuant to Realco's C.O. application. At the time of the inspection, he was informed that the prospective tenant was to be Oxford House. Mr. Rosen then informed Realco that he would have to report to the Township that Oxford House was the prospective tenant, and he told Realco that this "was a problem." Rosen subsequently did inform the Township's Director of Community Development, William Ragozine, that the house was to be occupied by Oxford House.

13. On the same day as Rosen's inspection, Francine Axelrad, attorney for Cherry Hill, wrote to Realco informing them that their application for a C.O. had been denied.[4] Her letter stated that the basis for the denial was that "Oxford House does not satisfy the definition of a single family under the Township's Zoning Ordinance."[5]

14. As a result of this letter, Realco Management sought to return the first month's rent and security deposit and sever its relationship with Oxford House. On March 20, 1992, however, this court entered a temporary restraining order, enjoining the Township from interfering with plaintiffs' occupancy of 911 South Kings Highway. Pursuant to that order, the Township reinspected the premises for maintenance code violations and, finding no such violations, issued a C.O. on March 30, 1992.

15. Since April 1, 1992, 911 South Kings Highway has been occupied by a group of recovering alcoholics and substance abusers. Since that time, there have been no

3. The C.O. requirement applies only to rentals and not sales of single family homes.

4. At the time the decision was made on March 11, 1992 to deny Oxford House a C.O., no one from Cherry Hill had contacted Oxford House or had any information about the background or the identity of the prospective tenants at 911 South Kings Highway. There is nothing in the application for a C.O. which inquires into the background of the proposed tenants nor is this information ordinarily obtained in connection with a C.O. application.

5. At the preliminary injunction hearing, the Township took the position that the C.O. was originally denied because of property maintenance code violations, as well as this violation of the zoning ordinance. Mr. Rosen testified on direct examination that he observed numerous code violations during his inspection of March 11th, and that he informed Mr. Ragozine of these violations. The Township does not dispute that any property maintenance code violations that did exist were cured by March 30, 1992, when the C.O. was finally issued pursuant to this court's order. Thus, it is clear that, at this juncture, the Township's ongoing opposition to plaintiffs' occupancy of the house is based solely on its position that the residents do not constitute a family under the zoning ordinance.

The dispute as to the code violations existing on March 11th, therefore, relates only to the question of what was the original basis for the Township's denial of the C.O. We believe that the most persuasive evidence on this question is the letter of March 11th to Realco Management from the Township's attorney. As noted above, the only basis for the denial of the C.O. set forth in that letter was the failure to comply with the zoning ordinance's "single family" requirement. Had there been an additional reason for the denial, we believe that it would have been stated in the letter. Since no additional reason was stated, we are persuaded that the sole reason for the Township's original denial of the C.O., as well as its ongoing opposition to plaintiffs' occupancy of 911 South King's Highway, is the Township's view that plaintiffs do not constitute a "family" under the zoning ordinance.

complaints from the neighbors or anyone else concerning the use of the premises.

16. In addition to 911 South Kings Highway, Oxford House also operates group homes at 141 Pine Valley Road and 108 Hilltop Court in Cherry Hill. The Township has previously filed suit in state court to evict the residents of those two homes because of their failure to meet the definition of family under the zoning ordinance.[6] None of the residents of those properties have been charged with any violation of any municipal ordinance in connection with their conduct at the residences, and none of those residents have been arrested for unauthorized use of drugs or alcohol at the premises. William Ragozine, the Director of Community Development for Cherry Hill, testified that neither he nor his department have any information indicating that the presence of these houses has had any adverse impact on the surrounding neighborhoods.

C. *The Township's Zoning Ordinance*

17. Under the Cherry Hill Zoning Ordinance, a "family" is defined as:

a single individual doing his own cooking and living upon the premises as a separate housekeeping unit, or a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit in a domestic relationship based upon birth, marriage or other domestic bond.

Cherry Hill interprets this ordinance so as to impose more stringent requirements on groups of unrelated individuals seeking to rent a single family home than on groups who are related by blood or marriage.

While groups related by blood or marriage who apply for a C.O. are automatically considered to meet the definition of family under the zoning ordinance, a group of unrelated individuals is initially presumed not to constitute a family. In order to obtain a C.O., a group of unrelated individuals must prove that they meet a standard of "permanency and stability." This standard is never imposed on groups related by blood or marriage because they are automatically found to meet the definition of "family" regardless of their particular circumstances. This "permanency and stability" standard is not referred to or defined anywhere in the zoning ordinance, and the Township has no written criteria according to which the standard may be uniformly applied.

18. When a group of people related by blood or marriage applies for a C.O., assuming that other requirements under the property maintenance code are met, it will be automatically granted on the basis of a simple application form which asks for little more than the proposed tenants' names. When a group of unrelated individuals applies for a C.O., however, it will initially be denied on the ground that they do not meet the definition of a single family.[7] The group can then only obtain a C.O. by applying to the Cherry Hill Zoning Board for a variance or an interpretation. The Zoning Board will then hold public hearings, at which the group members must present testimony establishing that they meet the vague standard of "permanency and stability." Until the Zoning Board makes a determination on such an application, the status quo will remain in effect,[8] and thus the

---

6. *See infra* ¶ 24.

7. Although Mr. Ragozine objected to the term "automatic" in this context and insisted that the initial determination as to whether a group constitutes a "family" is made on a "case-by-case" basis, we were unpersuaded by his apparent attempts to obfuscate the rigid and inflexible nature of his agency's decision-making process. Plaintiffs' counsel effectively impeached Mr. Ragozine's attempt to back away from earlier deposition testimony in which he clearly stated that a group of individuals not related by blood or marriage could never constitute a "family" in his view. Moreover, Mr. Ragozine admitted

that he could not think of a single instance in which a C.O. had been denied to a group of people related by blood or marriage on the basis of their failure to meet the definition of family or the "permanency or stability" standard. Nor, indeed, could he think of an instance in which any formal determination with regard to such a group's compliance with these standards was made.

8. Under state law, an appeal to the Zoning Board automatically preserves the status quo except in extraordinary situations where that would "cause imminent peril to life or property." N.J.S.A. 40:55D–75.

group will be unable to occupy the premises for which it has signed a lease.[9]

19. To the extent that the Township of Cherry Hill takes the position that Oxford House does not meet the definition of a single family under its zoning ordinance, Oxford House is precluded from obtaining a C.O. for any single family home in any of the five residential zones in the Township. The vast majority of the single family homes in Cherry Hill are located in these five residential zones.

20. Other than Oxford House, there are no halfway houses, group homes or any other homes in Cherry Hill which provide housing for recovering alcoholics and substance abusers. There is no provision in the Township's zoning ordinance for halfway houses or group homes.

### D. *The Nature of Alcoholism and Drug Addiction*

21. Addiction to illegal drugs or alcohol places severe limitations on people's lives, disrupting personal relationships, and impairing one's ability to advance in school or employment. These limitations continue to have a significant impact on an alcoholic's or drug addict's life even after the process of recovery has begun.[10] After completion of a rehabilitation program, it is crucial for recovering alcoholics and substance abusers to have a supportive, drug and alcohol-free living environment. The support obtained by being in a group of other recovering addicts substantially increases an individual's chances for recovery.[11]

22. There is a shortage of adequate housing in New Jersey for recovering substance abusers and alcoholics.[12] Closing

---

**9.** The Township's initial denial of a C.O. for Oxford House's occupancy of 911 South King's Highway has not been appealed to the Zoning Board. *See infra* ¶¶ 44–45.

**10.** Riley Regan, executive director of the Governor's Council on Alcoholism and Drug Abuse for the State of New Jersey, is himself a recovering alcoholic who has worked in the field of alcoholism and drug abuse for over 25 years and has extensive experience, training, education, and specialized knowledge in this field. We therefore find him to be an expert witness pursuant to Fed.R.Evid. 702. Mr. Regan testified at trial that even after completing a rehabilitation program, alcoholics and drug addicts face major limitations and "tremendous hurdles" in their lives. "Recovery is a very tenuous thing;" and unless recovering addicts and alcoholics are very careful to follow a "rigid regime" of attending support groups like Alcoholics Anonymous, and avoiding associations with people who may encourage them to drink or use drugs, they can easily fall back into relapse. Regan emphasized that the people who may pose the biggest threat to an individual's recovery are not necessarily other addicts or alcoholics, but rather, "people in the mainstream, people that mean well who take you to a ball game and who say come fishing with me and can't understand that you can't have a beer."

Additionally, one of the current residents of the Oxford House at 911 South Kings Highway, A.R., testified that alcoholism has "taken over [his] life" and is "the reason [he] cannot hold a job [or] relationships."

**11.** Mr. Regan testified that "the key ingredient in recovering from drug addiction and alcohol-

ism [and] being integrated back into the community . . . is the group support," and that an individual's chances of recovery are increased fivefold by living in a clean, stable drug and alcohol-free environment. Steve Polin, Oxford House Inc.'s Director of Community Affairs, who is himself a recovering addict and former Oxford House resident, testified that

> there is a certain amount of emotional bonding and support that one can only get from living or associating with other recovering addicts and alcoholics. In Narcotics Anonymous, it's said that the therapy value of one addict helping another is without parallel. And this is . . . seen on a daily basis in Oxford House.

Joan Treske, the Program Coordinator for a treatment program for substance abusers and mentally ill persons in Cherry Hill, who has worked with alcoholics and drug addicts for 12 years, testified that living in a supportive environment is particularly important for people who are in the early stages of recovery. With regard to one of her clients who is a current resident of 911 South Kings Highway, she said that living in Oxford House has made "the difference of night and day" for him.

> It has made an enormous difference for this particular individual to be living in a community where not only drugs are not available but he is required to be part of a smaller household community where he has really [been] required to . . . pull his weight.

**12.** Mr. Regan testified that the lack of adequate housing in a drug and alcohol-free environment is a "major, major problem." He stated that for alcoholics and drug addicts, finding adequate housing in a drug and alcohol-free neighborhood after a rehabilitation program is more

down the Oxford House at 911 South Kings Highway and forcing the residents to leave would be extremely detrimental to their recovery and would substantially increase the likelihood of relapse.[13]

The above constitutes the court's findings of fact in accordance with Fed. R.Civ.P. 52.

## CONCLUSIONS OF LAW

23. The Third Circuit has held that a district court may issue a preliminary injunction where the following standards are met:

1) plaintiffs are likely to succeed on the merits;

2) plaintiffs are subject to irreparable harm *pendente lite;*

3) defendants will not suffer substantial harm from the grant of an injunction; and

4) the public interest requires that plaintiffs be accorded relief.

*Sullivan v. City of Pittsburgh,* 811 F.2d 171, 181 (3d Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). We will address each of these standards in turn below.

### A. *Likelihood of Success on the Merits*

#### 1. *Effect of State Court Ruling*

24. Before we examine the merits of plaintiffs' federal claim, we pause briefly to consider defendant's assertion that we should give "deference" to the findings of

the state court in *Township of Cherry Hill v. Oxford House,* No. C–00181–90, slip op. (N.J.Sup.Ct.Ch.Div., April 27, 1992), a case involving the other two Oxford Houses in Cherry Hill,[14] in which issues similar to those presented here were decided. In that case, the Township of Cherry Hill sought to evict the Oxford House residents for their failure to comply with the zoning ordinance's definition of a single family. Oxford House and its residents argued, *inter alia,* that such enforcement action constituted discrimination on the basis of handicap in violation of the Fair Housing Act. Although the court initially issued an order enjoining the Township from any efforts to evict the residents, nearly two years later it issued the ruling cited above, which granted Cherry Hill's motion for a preliminary injunction and ordered the residents to vacate the two houses within 60 days.[15] In the course of that ruling, the state court held that the residents of the Pine Valley Road and Hilltop Court Oxford Houses did not constitute families under Cherry Hill's zoning ordinance, *see id.* at 16, and that they were not "handicapped" within the meaning of the Fair Housing Act, *see id.* at 20. It is these determinations to which defendant urges us to "defer."

■ 25. Presumably defendant's argument is based on the doctrines of res judicata and/or collateral estoppel. It is hornbook law, however, that a party in a second lawsuit cannot be bound by a determination

---

difficult than getting into the rehabilitation program itself.

 Mary Long, an aftercare counselor at an inpatient treatment program for alcoholism and drug addiction located in Williamstown, New Jersey, testified that it has been so difficult to find suitable housing for recovering alcoholics who have completed the program, that she has been forced to place clients in Pennsylvania.

**13.** Joan Treske testified that if the Oxford House at 911 South Kings Highway were closed, her client who currently resides there "would return to [his] communit[y] of origin and would be highly susceptible to returning to a life of addiction and alcoholism." Similarly, John Seeland, himself a recovering addict who has worked for Oxford House for three years and helped to set up the house at 911 South Kings Highway, testified that "[i]f people go back to where they

came from, they will act the way they acted before they left, which was to use."

 Riley Regan testified that if communities like Cherry Hill were able to shut down Oxford Houses, "it would be a major disaster for our field." Finally, one current resident of 911 South Kings Highway, when asked what would happen if he were forced to leave, testified: "At this time? It scares me. I don't know where I'd go or what I'd do, you know. I have no plans. I don't know what I'd do right now."

**14.** These other Oxford Houses are located at 141 Pine Valley Road and 108 Hilltop Court.

**15.** The residents have not been forced to vacate thus far, because on May 29, 1992, the Appellate Division granted Oxford House's motion for interlocutory review and stayed the lower court's preliminary injunction pending the appeal.

of a claim or issue in a previous lawsuit to which she was not a party. *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4406 at 46, and § 4416 at 138 (1981). Since the individual plaintiffs in this action—the current residents of 911 South Kings Highway—were not parties to the state court action, which concerned only the Oxford Houses on Pine Valley Lane and Hilltop Court, they clearly cannot be bound by that decision.

26. Secondly, although the organization itself, Oxford House, Inc., is a party to both actions, it is not bound by the state court's holding either. First, we note that the issue of whether Oxford House is in violation of the local zoning ordinance is not relevant to the question of federal law before us in this case. *See United States v. Audubon,* 797 F.Supp. 353, 357–58 (D.N.J.1991). The only question we have been asked to decide is whether Cherry Hill's actions discriminated against plaintiffs on the basis of handicap in violation of the Fair Housing Act. A finding that a Fair Housing Act plaintiff has violated a local zoning ordinance does not preclude a finding of discrimination in violation of the Act. Rather, it is well-established that the Act prohibits discriminatory land use decisions by municipalities, even when such decisions are "ostensibly authorized by local ordinance." *Ardmore, Inc. v. City of Akron,* No. 90–CV–1083, slip op. at 9, 1990 WL 385236 (E.D.Ohio, Aug. 2, 1990); *accord, Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329 (D.N.J.1991) (on motion for preliminary injunction: city's enforcement of zoning ordinance so as to prevent operation of local Oxford House in area zoned for single family residences violated Fair Housing Act); *Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Administration,* 740 F.Supp. 95 (D.P.R.1990) (government agency's denial of land use permit to open AIDS hospice violated Fair Housing Act); *Baxter v. City of Belleville,*

720 F.Supp. 720 (S.D.Ill.1989) (on motion for preliminary injunction: city's refusal to issue special use permit under zoning law to developer wishing to remodel building into residence for persons with AIDS violated Fair Housing Act). *See also* 42 U.S.C. § 3615 ("any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid [under the Fair Housing Act]"). Therefore, since the issue of Oxford House's compliance with the zoning ordinance is not before us in this case, the state court's ruling on that issue is irrelevant.

27. Secondly, we find that the state court's holding with regard to the definition of "handicap" under the Fair Housing Act is also not binding on this court. Although this is a legal issue that is before us in this case, we confront the issue here in the context of a different set of facts. The state court's holding that the residents were not "handicapped" was based on very specific factual findings regarding the particular individuals then residing at the Pine Valley and Hilltop Court Oxford Houses. Here we must determine whether a different set of individuals—the residents of 911 South Kings Highway—are "handicapped." Since the instant case presents us with an entirely distinct set of facts, the state court's ruling with regard to handicap is not binding on this court.[16] *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4417 at 148 (collateral estoppel "applies only when the same [factual] issue has been decided in one case and arises in another"). Thus, the state court's decision is not binding with respect to any of the plaintiffs in this action.

### 2. Definition of Handicap

28. Plaintiffs rest their claim for relief on the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.,* which was amended in 1988 to prohibit discrimination in housing on the

---

**16.** Nor do we feel compelled to treat as persuasive precedent the decision of a state court with respect to an issue of federal law.

basis of handicap. As amended, the Act defines "handicap" as follows:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
>
> (2) a record of having such an impairment, or
>
> (3) being regarded as having such an impairment,
>
> but such term does not include current, illegal use of or addiction to a controlled substance.

42 U.S.C. § 3602(h).

29. It is clear that Congress contemplated alcoholism and drug addiction as being among the kinds of "impairments" covered under this definition. First of all, the final clause excluding current users clearly indicates an intent that at least some prior users be covered by the definition. Additionally, the legislative history of the 1988 amendments,[17] as well as the regulations promulgated by the Department of Housing and Urban Development pursuant to the Act,[18] clearly support this interpretation. Finally, we also note that the definition of handicap in the Fair Housing Act was taken directly from § 504 of the Rehabilitation Act, 29 U.S.C. § 794,[19] which has consistently been interpreted by the courts to cover alcoholics and drug addicts.[20]

30. Thus, we are confident in saying as a matter of law that alcoholism and drug addiction (excluding current drug use) constitute "impairments" under the Act. What is less clear is whether the second step of the analysis—that is, whether the impairment substantially limits a major life activity—can be satisfied as a matter of law, and thus whether all alcoholics and drug addicts (excluding current users) can be said to be handicapped *per se*, as a matter of law. Under such an analysis, the only factual showing plaintiffs would need to make in order to prove handicap would be that they were alcoholics or drug addicts who were not currently using illegal drugs. Certainly, there are a number of cases interpreting the definition of handicap under the Rehabilitation Act which appear to take this approach. *See, e.g., Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir.) ("case law establishes that alcoholics are handicapped within the meaning of § 504"), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Rodgers v. Lehman*, 869 F.2d 253, 258 (4th Cir.1989) ("Alcoholism is a handicapping condition within the meaning of the Act"); *Crewe v. U.S. Office of Personnel Management*, 834 F.2d 140, 141–42 (8th Cir.1987) ("there can be little doubt that alcoholism is a handicap for the purposes of the Act"); *Davis v. Bucher*, 451 F.Supp. 791, 796 (E.D.Pa.1978) ("persons with histories of drug use, including present participants in methadone maintenance programs, are 'handicapped individuals' within the meaning of the statutory and regulatory language").[21] On the other

---

**17.** The House Report states:

> [I]ndividuals who have a record of drug use or addiction but who are not currently using illegal drugs would continue to be protected if they fell under the definition of handicap.... Just like any other person with a disability, such as cancer or tuberculosis, former drug-dependent persons do not pose a threat to a dwelling or its inhabitants simply on the basis of status. Depriving such individuals of housing, or evicting them, would constitute irrational discrimination that may seriously jeopardize their continued recovery.

H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2183.

**18.** The regulations state that:

> The term physical or mental impairment includes, but is not limited to, such diseases and conditions as ... drug addiction (other than

addiction caused by current, illegal use of a controlled substance) and alcoholism.

24 CFR § 100.201(a)(2).

**19.** The House Report accompanying the Fair Housing Act stated, "[t]he Committee intends that the definition be interpreted consistent with regulations clarifying the meaning of the similar provision found in section 504 of the Rehabilitation Act." H.R.Rep. No. 711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2183.

**20.** *See, e.g., Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1231 n. 8 (7th Cir.1980).

**21.** See also *United States v. Southern Management Corp.*, 955 F.2d 914, 918 (4th Cir.1992), for a bootstrap argument with regard to this issue

hand, other cases hold that the question of handicap under the Rehabilitation Act must be a fact-based inquiry to be made on a case by case basis. *See, e.g., Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986) (this inquiry "best suited to a 'case-by-case determination' ... as courts assess the effects of various impairments upon varied individuals"); *Perez v. Philadelphia Housing Authority,* 677 F.Supp. 357, 360 (E.D.Pa.1987) (same, *quoting Forrisi*), *aff'd,* 841 F.2d 1120 (1988).

■ 31. Here, we will take the more conservative approach, assuming that the second step of the analysis cannot be reached as a matter of law but must rest instead on some specific factual showing that a plaintiff's alcoholism or drug addiction "substantially limits [a] major life activity." Although the record presently before us does not contain such evidence with respect to each individual plaintiff, the expert testimony of Riley Regan with regard to the limitations faced by alcoholics and drug addicts in general, in conjunction with the testimony of one of the current residents of 911 South Kings Highway as to the limitations he suffers, is sufficient at this early stage in the proceedings to meet plaintiffs' present burden of showing a likelihood of success on the merits.

32. This testimony shows that alcoholism and drug addiction place severe limitations on people's lives, including disrupting personal relationships and impairing one's ability to advance in education or employment, and that such limitations do not magically disappear at the moment that abstinence begins, but rather continue to effect a person's functioning at least through the early stages of recovery. It is because of these limitations that recovering drug addicts and alcoholics need to live in a supportive environment of the type that Oxford House provides. Many witnesses testified as to the crucial importance of this supportive and drug-free environment in

under the Fair Housing Act. There the court essentially used its finding of discrimination to prove handicap. Finding that plaintiffs had been denied housing on the basis of their status as drug addicts and alcoholics, the court rea-

ensuring that a recovering alcoholic or addict does not relapse.

33. These generalized findings are sufficient to demonstrate that plaintiffs are likely to succeed at trial in demonstrating that each individual plaintiff is limited with respect to major life activities, or that residents of Oxford Houses in general are by definition so limited. In addition, plaintiffs' evidence shows that all of the residents of 911 South Kings Highway are alcoholics or drug addicts who have completed a rehabilitation program prior to moving into the house, and that if they resume the use of alcohol or drugs they will be immediately expelled. We are therefore satisfied that the final prong of the definition of handicap—excluding current users of illegal drugs—is also satisfied. Thus, plaintiffs have met their burden at this stage in the proceedings of demonstrating a likelihood of success on the merits with respect to proving that they are "handicapped" within the meaning of the Act.

### 3. *Discrimination*

■ 34. Under § 804 of the Fair Housing Act it is unlawful

to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented or made available, or

(C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1). To prove a violation of § 804, plaintiffs must show either intentional discrimination or a discriminatory impact. *See Doe v. City of Butler,* 892 F.2d 315, 323 (3d Cir.1989); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1343 (D.N.J.1991); *Baxter v. City of Belleville,* 720 F.Supp. 720, 732 (S.D.Ill.

soned that their inability to obtain housing (a major life activity) due to the attitudes of others, therefore qualified them as handicapped under the third prong of the definition ("being regarded as having such an impairment").

1989). Because we find that plaintiffs have demonstrated a likelihood of success on the merits under the disparate impact theory, we need not reach the issue of intentional discrimination.

35. Under the disparate impact theory, the court's analysis is similar to that in Title VII cases. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 148 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 99 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978). Thus, plaintiffs can establish a *prima facie* case by showing that the Township's action had a greater adverse impact on a protected group than on others, regardless of intent. *See Huntington,* 844 F.2d at 935. Once plaintiffs establish a *prima facie* case, the burden shifts to the defendant to demonstrate some legitimate, nondiscriminatory reason for their action, and that no less discriminatory alternatives were available. *See Huntington* 844 F.2d at 939; *Rizzo* 564 F.2d at 149.

36. With regard to this analysis, it is important to note that Congress defined "discrimination" as used in § 804 to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The legislative history indicates that Congress borrowed this language from case law interpreting § 504 of the Rehabilitation Act, particularly *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and that it intended for those cases to supply the governing standard as to what accommodations are reasonable.[22] In *Davis* the Supreme Court held that an accommodation is unreason-

able if it either imposes "undue financial and administrative burdens," *id.* at 412, 99 S.Ct. at 2370, or requires a "fundamental alteration in the nature of a program," *id.* at 410, 99 S.Ct. at 2369. *See also Alexander v. Choate,* 469 U.S. 287, 300 n. 20, 105 S.Ct. 712, 720 n. 20, 83 L.Ed.2d 661 (1985); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1384 (3d Cir.1991). Thus, the courts have applied this same standard in interpreting the reasonable accommodation provision of the Fair Housing Act. *See United States of America v. City of Taylor,* No. 91–CV–73218, slip op. at 13 (E.D.Mich. July 15, 1992) (accommodation reasonable where city would "not have to alter its zoning scheme or incur any undue administrative burdens"); *United States v. Village of Marshall,* 787 F.Supp. 872, 878 (W.D.Wis.1991) (accommodation is unreasonable if it "undermine[s] the basic purpose which the requirement seeks to achieve"); *Oxford House–Evergreen v. City of Plainfield,* 769 F.Supp. 1329, 1344 (D.N.J.1991) (accommodation reasonable where it "would not cause undue financial burden to the City").

37. Here, plaintiffs have established a *prima facie* case of disparate impact by showing that the Township's interpretation of the definition of "family" in its zoning ordinance imposes more stringent requirements on groups of unrelated individuals wishing to live together in a rental property than on individuals related by blood or marriage. Because people who are handicapped by alcoholism or drug abuse are more likely to need a living arrangement such as the one Oxford House provides, in which groups of unrelated individuals reside together in residential neighborhoods for mutual support during the recovery process, Cherry Hill's application of this ordinance has a disparate impact on such handicapped people.[23]

---

**22.** *See* H.R.Rep. No. 711, 100th Cong., 2d Sess. 25 (1988), *reprinted in,* 1988 U.S.Code Cong. & Admin.News 2173, 2186.

**23.** We note here that a showing of disparate impact does not require any showing of intent or animus. Therefore, while we make no finding as to intent on the present record, even if we were to assume that Cherry Hill's zoning en-

forcement was undertaken for a facially neutral reason having nothing to do with plaintiffs' status as recovering drug addicts and alcoholics, plaintiffs' *prima facie* showing of a violation of the Act through disparate impact would remain intact.

38. In response, defendant has failed to present evidence establishing a legitimate, nondiscriminatory reason for their action, and that a reasonable accommodation was impossible. Defendant appears to argue that the reason for the denial was the fact that the residents of Oxford House do not have the requisite "permanency and stability" to qualify as a family unit under the ordinance. While the New Jersey Supreme Court has held that stability and permanence are legitimate criteria on which to base zoning restrictions in residential neighborhoods, *see Berger v. State,* 71 N.J. 206, 223, 364 A.2d 993 (1976), it has also held that relationship by blood or marriage may not be used as a litmus test for such qualities. Rather, "the standard ... must be functional, and hence capable of being met by either related or unrelated persons." *Borough of Glassboro v. Vallorosi,* 117 N.J. 421, 431, 568 A.2d 888 (1990) (*citing Berger,* 71 N.J. at 225–27, 364 A.2d 993). Here the record establishes that just such a litmus test is employed by the Township of Cherry Hill in issuing C.O.'s. Groups related by blood or marriage are automatically issued C.O.'s without any further inquiry into permanency or stability, while unrelated groups are automatically denied C.O.'s and forced to appeal their case by way of an application to the Zoning Board for a variance, which requires the group to prove its permanency and stability in a public hearing. We find that plaintiffs were denied a C.O. on the basis of their status as unrelated persons and that under the New Jersey Supreme Court's opinion in *Vallorosi* that cannot constitute a legitimate reason for the denial.[24]

39. Further, we hold that defendant did not meet its burden of establishing that no less restrictive alternative was available or that no reasonable accommodation could be made.[25] Indeed, the evidence indicates that accommodating plaintiffs by waiving the single family requirement and granting them a C.O. would impose no administrative or financial burdens on the Township whatsoever, and would not effect a fundamental change in the nature of the neighborhood. *See Davis,* 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. Defendant offered no evidence that such an accommodation would significantly compromise the Township's legitimate interests in the residential character of the surrounding neighborhood. On the contrary, the evidence shows that 911 South Kings Highway is surrounded by offices, apartment buildings and duplexes. If anything, it seems that permitting its use by Oxford House as a residence would enhance rather than detract from the residential character of the neighborhood. Additionally, the record contains uncontroverted testimony that there have been no complaints from neighbors with regard to the use of the premises at 911 South Kings Highway. Nor is there any evidence that the presence of any of the three Oxford Houses in Cherry Hill has had any adverse impact on the surrounding neighborhoods.

40. In short, we are hard-pressed to find any evidence in this record as to how such an accommodation would impact negatively in any way upon the Township of

---

24. We wish to make clear that we have not been presented with a constitutional challenge to Cherry Hill's zoning ordinance and we do not make any holding with respect to the constitutionality of the ordinance. We examine Cherry Hill's application of the ordinance in light of constitutional norms as enunciated by the New Jersey Supreme Court only as a means for determining whether there is a legitimate reason for Cherry Hill's disparate treatment of plaintiffs under the ordinance which would shield the township from plaintiffs' discrimination claim under the Fair Housing Act.

25. As an initial matter, we reject defendant's contention that requiring plaintiffs to apply to the Zoning Board for an interpretation or variance constitutes a reasonable accommodation on the part of the Township. "Reasonable accommodation" means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual. Thus, where everyone is provided with "equal access" to a building in the form of a staircase, reasonable accommodation to those in wheelchairs may require building a ramp. Here, defendant's suggestion that making the process of applying for a C.O. *more* onerous for plaintiffs than it is for the majority of applicants, somehow constitutes a "reasonable accommodation," stands the concept on its head. It is analogous to arguing that a rule requiring only handicapped people to pay a special fee before entering a building constitutes a reasonable accommodation.

Cherry Hill or the public in general.[26] Therefore, the record indicates that by refusing to grant plaintiffs a C.O., the Township has failed to make a reasonable accommodation. *See United States of America v. City of Taylor*, No. 91–CV–73218, slip op. at 12 (E.D.Mich. July 15, 1992) (municipality's refusal to grant zoning approval for group home for twelve elderly disabled people in single family residential zone violated reasonable accommodation provision of Fair Housing Act); *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1344 (D.N.J.1991) (on preliminary injunction motion, municipality's refusal to grant zoning approval for Oxford House in single family zone showed violation of Fair Housing Act). This, in conjunction with plaintiffs showing of disparate impact, is sufficient to demonstrate a likelihood of success in proving that the Township's actions violated the Fair Housing Act.[27]

### B. *Irreparable Injury*

■ 41. We note at the outset that the 11th Circuit has taken the position that a showing of a substantial likelihood that a defendant has violated the Fair Housing Act is itself sufficient to create a presumption of irreparable harm, which shifts the burden to defendant to prove that any injury that may occur is not irreparable. *See Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir.1984), *cert. denied*, 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984); *see also Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803 (3d Cir.1989); *Gov't of Virgin Islands Dep't of Conservation & Cultural Affairs v. Virgin Islands Paving,*

*Inc.*, 714 F.2d 283, 286 (3d Cir.1983). Here, however, even if we place the initial burden on plaintiffs, we find that this second prong of the preliminary injunction standard has been met.

42. Plaintiffs have presented evidence demonstrating that the ability of recovering alcoholics and drug addicts to live in a supportive drug free environment in a quiet residential area is critical to their recovery. Plaintiffs' expert witness, Riley Regan, testified that an addict's or alcoholic's chances of recovery are enhanced fivefold by living in a drug and alcohol-free environment. Additionally, the record is replete with testimony from individual drug addicts and alcoholics as well as professionals in the field, who all agree that Oxford House provides a supportive environment that is critical to the continued recovery of its residents and that shutting down the house at 911 South Kings Highway would result in a high likelihood of relapse for its residents.

43. This Circuit has already held that an action that jeopardizes the recovery process for a group of alcoholics and threatens to push them into relapse causes just the kind of irreparable harm that justifies preliminary injunctive relief. In *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 179–80 (3d Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987), the circuit court observed:

> plaintiff-appellees are primarily recovering alcoholics who are in a critical stage of their recovery.... Without proper care, supervision and peer support each could easily suffer a relapse.... For these alcoholics, a relapse threatens not

---

**26.** There is an oblique reference in the record to "citizen opposition" to the two Oxford Houses at 141 Pine Valley Road and 108 Hilltop Court, but the record contains no elaboration as to the nature of that opposition. Nor is there any indication that any such opposition has been voiced with respect to the Oxford House at issue here. In any case, the fact that citizens may vociferously oppose the establishment of a home for handicapped people in their neighborhood can hardly be cited as a legitimate justification for discriminatory treatment of the handicapped. As the Supreme Court has warned, "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly,

give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

**27.** Plaintiffs may also be able to succeed in proving intentional discrimination in violation of § 804, 42 U.S.C. § 3604(f)(1) and/or interference with the exercise of rights under the Act in violation of § 818, 42 U.S.C. § 3617, both of which have also been alleged. Because we find a likelihood of success under the disparate impact/reasonable accommodation analysis, however, we need not reach these alternative claims at this juncture.

only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death. The record reflects that alcoholics who had been denied treatment at the Center were unable to end their alcohol abuse and suffered severe injury or death as a result ... and it is clear that [the centers' managers] provide[ ] the only treatment available for appellees.... Indeed, it is difficult to conceive of many facts which would more compellingly argue for appellees' relief.

Here too we find that the uncontroverted evidence showing that a failure to issue an injunction will substantially increase the likelihood of relapse for the current residents of 911 South Kings Highway constitutes a sufficient showing of irreparable harm.

44. Defendant argues that it is premature to make a finding that plaintiffs will suffer irreparable harm by the denial of a C.O. because the Township has not yet made a final determination that a C.O. will be denied. Thus, at this juncture, the Township argues, it is simply asking plaintiffs to apply to the Cherry Hill Zoning Board for an interpretation or a variance, and since plaintiffs will not suffer any irreparable harm by making such an application, they must be required to exhaust this administrative remedy before coming to this court for relief.

45. We are not persuaded by this argument. The record indicates that an appeal to the Zoning Board takes time [28]—involving, among other things, a public hearing— and that during the pendency of such a proceeding, plaintiffs would not be able to occupy the house. Since Oxford House relies on residents of its houses to pay the rent, it would have no way of meeting its obligations under its lease of 911 South Kings Highway during the pendency of the zoning proceeding, and would therefore presumably lose the lease. Indeed, there was testimony at the hearing that the landlord immediately sought to return the security deposit and cancel the lease upon learning of the Township's initial refusal to issue the C.O. last March. Presumably, had Oxford House appealed the denial of the C.O. to the Zoning Board, as defendant suggests, rather than seeking the immediate intervention of this court, the lease would have been canceled before a determination was ever reached by the Zoning Board. Moreover, even assuming that Oxford House could somehow keep the lease, our findings indicate that a delay of even a few weeks in allowing the individual plaintiffs to move into the Oxford House would increase their chances of relapse and thus would be likely to cause irreparable injury.[29]

46. Therefore, regardless of the ultimate outcome of a proceeding before the Zoning Board, we find that the delay involved would cause plaintiffs to suffer irreparable harm. Therefore they are not required to exhaust such procedures before obtaining relief from this court. *See Easter Seal*, 798 F.Supp. at 235–36 (*citing American Fed'n of Gov't Employees v. Resor*, 442 F.2d 993, 995 (3d Cir.1971)).[30] Accordingly, we find that plaintiffs will

---

**28.** Under state law, a zoning board has 120 days after an appeal is filed to render a decision. *See* N.J.S.A. 40:55D–73.

**29.** We also note that plaintiffs would probably have difficulty presenting their case to the Zoning Board because individual residents or potential residents would, for obvious reasons, wish to remain anonymous and therefore would be hesitant to testify in a public hearing. To that extent, it may be that pursuit of such an avenue by plaintiffs would either cause harm to plaintiffs by forcing them to identify themselves publicly as addicts, and/or amount to an "exercise in futility." *The Easter Seal Society of New Jersey v. Township of North Bergen*, 798 F.Supp.

228, 236 (D.N.J.1992) (where "[a]ny further efforts ... to work within the municipal administrative apparatus would be an exercise in futility," exhaustion is not required) (*citing Doe v. Butler*, 892 F.2d 315, 322 (3d Cir.1989)).

**30.** It is also worth noting that the issue that the Township wishes to see resolved by the Zoning Board—whether plaintiffs meet the definition of "family" in the ordinance—is irrelevant to our determination here under the Fair Housing Act. *See supra* ¶ 26. Indeed, our finding that a Zoning Board proceeding is likely to cause irreparable injury to plaintiffs, also constitutes a basis for our holding that the Township has violated the Fair Housing Act by imposing more onerous procedural requirements on plaintiffs than are

suffer irreparable harm if an injunction is not granted. They have therefore met the second prong of the preliminary injunction standard.

### C. *Harm to Defendant*

47. As noted above in our discussion of the Fair Housing Act's reasonable accommodation requirement, we search the record in vain for any showing by the defendant as to how the granting of the requested injunction will harm the defendant. Any threat to the residential character of the neighborhood is minimal at most and is overwhelmingly outweighed by the potential for harm to the individual plaintiffs if the injunction is denied and they are forced to leave Oxford House.

### D. *Public Interest*

■ 48. Through its enactment of the Fair Housing Amendments of 1988 and the Federal Anti–Drug Abuse Act of 1988, Congress has expressed a strong public policy favoring an end to discrimination in housing on the basis of handicap and favoring the establishment of housing programs for recovering drug addicts and alcoholics. Indeed, the Anti–Drug Abuse Act's provision encouraging the establishment of revolving loan funds by states to make start-up loans to help establish group homes for recovering drug addicts and alcoholics was based specifically on the model of Oxford House. *See* 134 Cong.Rec. E 3732 (daily ed. Nov. 10, 1988) (remarks of Rep. Madigan). Thus, Congress has directly endorsed Oxford House itself as an organization worthy of public support because of its role in helping to stem the national epidemic of alcohol and drug abuse. This public policy is further reflected in enactments of the New Jersey Legislature supporting programs that assist recovering alcoholics and substance abusers. *See* N.J.S.A. 26:2B–1 *et seq.*

49. Viewing these clear expressions of legislative support for the goal of reducing drug addiction and alcoholism against the backdrop of the current atmosphere of overwhelming public concern over the impact of drugs on our society, as reflected by the much publicized federally-declared "war on drugs," we would be hard-pressed to deny the significance of the public interest in supporting efforts like Oxford House to assist in and encourage the recovery of alcoholics and drug addicts. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803 (3d Cir.1989) (legislative expressions of public policy through statutes may be relied on to define "public interest" for purposes of preliminary injunction analysis). Accordingly, we hold that the public interest factor weighs heavily in favor of the issuance of a preliminary injunction in this case.

The above constitutes the court's conclusions of law in accordance with Fed. R.Civ.P. 52.

### CONCLUSION

Therefore, based on the foregoing findings of fact and conclusions of law, we find that all four preliminary injunction standards have been satisfied, and we therefore find sufficient grounds for the issuance of a preliminary injunction, enjoining the Township of Cherry Hill from interfering with the occupancy of the single family house at 911 South Kings Highway by Oxford House, Inc. and John Does One through Seven.

---

imposed on others and by failing to make a reasonable accommodation. Thus, it is the enforcement of the zoning ordinance itself, including the Township's position that plaintiffs must go before the Board, that constitutes a violation of the Act. To require plaintiffs to "exhaust" those procedures that themselves violate the Act before seeking the protection of the Act in federal court would be nonsensical at best.