The **UNITED STATES of America, Plaintiff,**

v.

**THE HILLHAVEN CORPORATION, Hillhaven Properties, Ltd., Athalie F. Yeiter, and John Weibel, Defendants.**

No. 94CV–770S.

United States District Court,
D. Utah,
Central Division.

Feb. 7, 1997.

**260**

Stephen L. Roth, Asst. U.S. Atty., Salt Lake City, UT, for Plaintiff.

Stephen E. Hale, Kimball Parr Waddoups Brown & Gee, Salt Lake City, UT, John J. Vlahos, Hanson Bridgett Marcus Vlahos & Rudy, San Francisco, CA, for Defendants.

Order Granting Defendants' Motion
for Summary Judgment

SAM, District Judge.

Attorneys for the United States brought this action against the owners and directors of Crosslands Retirement Community, alleging that they unlawfully discriminated against an 83–year–old resident, Hazel Anderson, on the basis of her handicap and that they refused to make reasonable accommodation for her, in violation of two provisions of the Fair Housing Act, 42 U.S.C. §§ 3604(f)(2) and (f)(3)(B).[1] After taking Mrs. Anderson's deposition, the defendants moved for summary judgment. For reasons discussed more fully below, the motion is granted.

### I. Issues of fact

In a memorandum and affidavits supporting their motion, the defendants set forth certain facts. The government filed a memorandum and affidavits in opposition Although the government added a number of facts to the record, it did not specifically controvert any of the material facts set forth by the defendants. (Plaintiff's Opposition at 2–5.) Accordingly, the facts set forth by the defendants are deemed admitted. *See* Fed. R.Civ.P. 56(e), D.Ut.R. 202(b)(4). Those facts may be summarized as follows:

1. Mrs. Anderson is handicapped by spinal stenosis and arthritis in both knees.

2. She uses a motorized cart for mobility.

3. Crosslands is a 120–unit retirement community in Sandy, Utah.

4. Mrs. Anderson occupies unit 218, a two-room apartment.

5. Exhibit A to the defendant's memorandum is a diagram of the Crosslands, showing the layout of the residential units and common areas (dining room, parlor, library, mailroom, and front lobby).

6. Crosslands has 138 residents, of whom 31 have hearing impairments, 17 have sight impairments, 18 use walkers, 6 use wheel-

---

1. The government also claimed violation of § 3604(c) but now concedes this claim is not supported by the evidence. (Plaintiff's Opposi- tion to Defendants' Motion for Summary Judgment at 7.)

chairs, 15 use canes, 2 use crutches, and 6 require oxygen.

7. In late 1992 and early 1993, at least 4 residents used motorized carts.

8. Some residents used the carts for personal convenience and not out of necessity.

9. Mrs. Anderson believes that "Dr. Latimer" was one who used the cart for convenience.

10. On or about January 4, 1993, at a "town hall meeting" for all residents, Crosslands adopted safety guidelines restricting the use of motorized carts in common areas.

11. The sole purpose for establishing the guidelines is to assure the safety of all persons who dwell, visit or work at the Crosslands.

12. Mrs. Anderson believes that Crosslands established the guidelines for safety reasons.

13. She believes that no one in the Crosslands' management had any kind of animosity or bad feelings towards her personally.

14. In response to her concerns, the Crosslands modified the safety guidelines to restrict carts only during meal times, and sent a memo to that effect to all residents, dated February 10, 1993.

15. The safety guidelines were again modified orally to allow carts in common areas during peak hours if there were not crowds of people there. Residents were asked to check with the front desk during those hours (11:00 A.M. to 1:30 P.M. and 4:00 to 6:00 P.M.) to determine whether residents could enter those areas in a safe manner with carts.

16. The guidelines have not restricted Mrs. Anderson from participating in any activities at the Crosslands.

17. Until November 1993 when she fell in her apartment, Mrs. Anderson was able to comply with the guidelines (using a walker or wheelchair) without ever missing a meal or any other activity she wanted to attend in common areas.

18. After her fall, Crosslands further amended the guidelines to allow Mrs. Anderson to use her motorized cart to enter and exit the dining room at meal times.

19. Mrs. Anderson is "very happy" with the current arrangements for her use of the dining room.

20. There is nothing that she wants to do before or after lunch or dinner in the common areas that she is unable to do.

21. Although Mrs. Anderson said the guidelines inhibited her ability to socialize and attend bingo games, she admits that she never was late for a bingo game and that the guidelines did not change the people with whom she socialized or the times she socialized with them.

22. Mrs. Anderson believes the guidelines were a "good policy."

23. She never used the library, before or after the guidelines were implemented.

24. She routinely picks up her mail after lunch but has no problem picking up her mail after 6:00 P.M.

25. No day has gone by that Mrs. Anderson was unable to get her mail because of the guidelines.

26. Mrs. Anderson has never had to delay a visit to the administrative office because of the guidelines.

27. She is not inconvenienced by using wing elevators rather than the central elevator.

28. She believes it is better not to use motorized carts in the central elevator at peak times.

29. She preferred to use the wing elevator during peak hours even before the guidelines were implemented.

30. When Mrs. Anderson needs to use the central elevator during peak hours, she is escorted through the lobby by an employee of the Crosslands, and this does not pose an inconvenience to her.

31. If she needed to go out the front lobby door during crowded meal times, a Crosslands staff member would escort her.

32. She does not like to operate her motorized cart in the lobby when it is crowded because people could fall on her and she

"could hurt them" She prefers using the wing elevator for this reason.

33. She thinks it is a good policy and very reasonable to be escorted through the lobby when there are groups of people there for the "safety of everybody concerned."

34. She admits that it is important to use extreme caution when operating a motorized cart in a crowd.

35. Mrs. Anderson is blind in her left eye, which results in a 40–60 degree loss of her total visual field, and has an additional 10–15 degree blind spot in her right eye.

36. She must drive backwards, looking over her shoulders, to maneuver her motorized cart into or out of elevators.

37. At times she mistakenly goes in reverse when she intends to go forward.

38. She believes it is reasonable to have rules for the safe operation of motorized carts.

39. She believes it is reasonable for management to be concerned about the safety of other people with respect to the indoor use of motorized carts at Crosslands.

In response to this statement of facts, the government argues:

> Most pertinently to the instant motion, *Mrs. Anderson vigorously disputes the contention that motorized cars are inherently dangerous for indoor use, or that she in particular is not capable of using one safely....* She also contests defendants' assertion that her deficiencies of vision preclude her from operating safely.

*Id.* at 5 (emphasis added).

■ The government mischaracterizes the defendants' statements. They have not said that carts are inherently dangerous or that Mrs. Anderson is not capable of using one safely. Nor would they need to prove such statements to show that the government cannot prevail on its discrimination claim. As discussed below, the defendants would only need to show that the allegedly discriminato-

ry practice had a legitimate purpose; that is, a "business necessity" or "manifest relationship to the housing in question." *Mountain Side Mobile Estates v. Secretary of HUD*, 56 F.3d 1243, 1254 (10th Cir.1995).

■ The defendants' statements of fact are supported by the record. Indeed, many of the facts are based on Mrs. Anderson's own deposition testimony. The government responded with a declaration by Mrs. Anderson in which she contradicts some of her prior testimony.[2] However, the court agrees that it would be "novel jurisprudence" for a party to create a triable issue of fact solely by allowing its main witness to contradict herself (*See* Defendants' Reply Brief at 7 n. 3.)

For these reasons, the court finds no genuine issue of material fact. The next question is whether the defendants are entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c).

### II. Questions of law

#### A. Discrimination

■ Unlawful discrimination may occur by disparate treatment or by disparate impact. *Mountain Side*, 56 F.3d at 1250. In this case, the government's "primary theory of liability" is that "under a disparate impact analysis, the challenged restrictions ... unlawfully discriminate against [Mrs. Anderson] because of her handicap." (Plaintiff's Opposition at 10.)[3]

■ "To establish a prima facie case of disparate impact discrimination, plaintiffs must show that a specific policy caused a significant disparate effect on a protected group." *Mountain Side*, 56 F.3d at 1251. If this showing is made, the burden shifts to the defendant, and the court considers "the interest of the defendant in taking the action which produces the discriminatory effect." *Id.* at 1253. "[W]hen a defendant can present valid non-pretextual reasons for the chal-

---

2. The government also submitted the declaration of Mrs. Anderson's grandson, Gary M. Buckway, as discussed below.

3. The government admits there is no evidence of intentional discrimination, which is the "ultimate question" in a disparate treatment case. *Mountain Side*, 56 F.3d at 1250; *see* Plaintiff's Opposition at 11.

lenged practices, the courts should not be overzealous to find discrimination." *Id.* The plaintiff must then "show that other [policies], without a similarly undesirable ... effect, would also serve the [defendant's] legitimate interest." *Id.* at 1254.

■ The government has not pointed to evidence that Crosslands' guidelines caused a *significant* disparate effect on a protected *group*. Instead, the government argues that Mrs. Anderson herself is impacted and that "other persons in Mrs. Anderson's situation may move into the Crosslands at any time— or more likely, may be discouraged from doing so by defendants' restrictions on the use of carts." (Plaintiff's Opposition at 13.)

As to the impact on Mrs. Anderson, the government contends she "has in fact been profoundly injured by the emotional impact of the restrictions." *Id.* at 14. Her declaration about this injury is inconsistent with her deposition testimony, but the government explains:

> [H]er deposition testimony went chiefly to the restrictions as they exist today [before several modifications made at her request]. It should not be forgotten that Mrs. Anderson had to deal with a significantly more restrictive policy for a period of six weeks.[4]

*Id.*

The court believes this evidence is insufficient to make out a prima facie case of discrimination. Moreover, the defendants presented a legitimate, non-pretextual reason for the guidelines: ensuring the safety of all Crosslands residents, many of whom have their own handicaps of vision, hearing, or balance. As the defendants point out,

> The reasons for the policy restricting indoor operation of [motorized carts] in crowds of feeble elderly people are so manifest that [Mrs.] Anderson herself admits to its reasonableness ...
>
> [Mrs.] Anderson's declaration that she can operate her cart safely does not detract

from her repeated statements of concern regarding her safety and others' when the cart is operated in a crowded elevator or lobby. It is possible, for example, that in close quarters, no matter how carefully she drives and seeks to overcome her vision deficits, another resident with a vision, hearing, or balance [handicap] may step into her path, with one or more resulting injuries. Carts are not "inherently dangerous" and neither is [Mrs.] Anderson, but when all the circumstances are considered together, *the threat to the goal of safe housing for the elderly is clear to a reasonable person.*

(Defendants' Reply Brief at 7.)

Thus, even if the government could establish a prima facie case of disparate impact, the defendants have shown a "genuine business need" for the challenged practice.

Nor has the government pointed to sufficient evidence that a less restrictive alternative would have satisfied the safety interest. Mrs. Anderson's grandson, Mr. Buckway, testified that he suggested that "management conduct a series of meetings with residents, in order to educate users of motorized carts to the necessity of safe operation, and to help other residents adjust to the presence of such carts." (Declaration of Gary F. Buckway, ¶ 4.) The government similarly argues that the defendants could have established "rules of the road" or driver testing "to assess the capabilities of individual cart owners." (Plaintiff's Opposition at 18.) But there is no evidence before the court that these proposals would adequately address Crosslands' safety concerns.[5]

For these reasons, the defendants are entitled to summary judgment on the government's discrimination claim.

### B. Refusal to make reasonable accommodation

■ A "reasonable accommodation" has been defined as "changing some rule that is

---

4. Of course, if the injury occurred during a six-week period in the past, it would not impact other persons who move into Crosslands in the future.

5. As the defendants argue, it would seem that "driver and pedestrian education is not an apt solution, when the situation is akin to motorists driving their vehicles on a pedestrian sidewalk." (Defendants' Reply Brief at 8 n. 5.)

generally applicable so as to make its burden less onerous on the handicapped individual." *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1502 (10th Cir.1995) (quoting *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992)). The facts in this case show that the defendants repeatedly changed the guidelines on use of motorized cart to accommodate Mrs. Anderson. Indeed, there is no evidence that they ever refused to accommodate her.

The guidelines are not an outright ban on the use of motorized carts but restrict their use in selected common areas at meal times. Reasonable exceptions have been made by escorting Mrs. Anderson through the lobby and by driving her into the dining room via the parlor for meals. There is no restriction at any time on her use of the motorized cart in residents' rooms, hallways, upper floor assembly room, or wing elevators. Thus, she has meaningful access to the Crosslands as a whole, as evidenced by her testimony that she can do what she wants and participate in all the activities of her choice.

Finally, the court believes the purpose of the Fair Housing Act would not be served by invalidating guidelines which were established for the safety of elderly persons living in a retirement community—many of whom are feeble and handicapped in vision, hearing, or balance—in order to allow those few persons who drive motorized carts to do so without any restrictions on the time, place, or manner of their operation.

### III. Order

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment is granted. The plaintiff's claims are dismissed.