*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CV-524 and 15-CV-559

WILFRED WELSH,
　　　　APPELLANT/CROSS-APPELLEE,

v.

BEVERLY MCNEIL and ALVIN ELLIOTT,
　　　　APPELLEES/CROSS-APPELLANTS.

06/29/2017

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeals from the Superior Court
of the District of Columbia
(CAB-429-14)

(Hon. John M. Campbell, Trial Judge)

(Argued May 12, 2016　　　　　　　　　　　　Decided　June 29, 2017　)

*Michael C. Forster* for appellant/cross-appellee.

*Steven G. Polin* for appellees/cross-appellants.

Opinion for the court Per Curiam.

Opinion by Associate Judge Glickman, concurring in part and dissenting in part, with whom Associate Judges Beckwith and McLeese join in Parts I, II and III B, at page 3.

Concurring opinion by Associate Judge Beckwith with whom Associate Judge McLeese joins, at page 47.

Before GLICKMAN, BECKWITH, and MCLEESE, *Associate Judges*.

PER CURIAM: Wilfred Welsh, a member of the Chaplin Woods Homeowners Association ("HOA"), sued fellow HOA members Beverly McNeil and Alvin Elliott (the "McNeils") on the ground that they had leased out their home in violation of the HOA's bylaws. The McNeils brought counterclaims under the Federal Fair Housing Act[1] and the District of Columbia Human Rights Act.[2] The trial court granted summary judgment against Mr. Welsh on the ground that he lacked standing and against the McNeils on the merits. Mr. Welsh and the McNeils now appeal these respective rulings.

As to Mr. Welsh's claims, we reverse the judgment of the trial court for the reasons stated in Judge Beckwith's opinion. As to the McNeils' counterclaims, we reverse the trial court's judgment for the reasons stated in Judge Glickman's opinion. The case is remanded for further proceedings consistent with these opinions.

*So ordered.*

---

[1] 42 U.S.C. §§ 3601-3619 (2012).

[2] D.C. Code §§ 2-1402.21 to 2-1402.24, 2-1402.61 (2012 Repl.).

GLICKMAN, *Associate Judge*, with whom BECKWITH and MCLEESE, *Associate Judges*, join in parts I, II, and III.B, concurring in part and dissenting in part: These appeals are from the resolution by summary judgment of a dispute between members of the Chaplin Woods Homeowners Association. Members Beverly McNeil and Alvin Elliott (the "McNeils") rented their townhouse to a group of recovering alcoholics and substance abusers as a residence. The terms of the rental agreement did not meet certain requirements in the Homeowners Association's Bylaws. Member Wilfred Welsh ("Welsh") sued the McNeils in Superior Court for leasing in violation of the Bylaws and without the approval of the Association's Board of Directors. The Homeowners Association itself did not join in his complaint and has not been a party to this litigation. The McNeils counterclaimed that Welsh was violating the Federal Fair Housing Act and the District of Columbia Human Rights Act by opposing their request for a reasonable accommodation – Board approval of their rental agreement – that would allow them to provide a dwelling to persons with disabilities. Welsh and the McNeils each moved for summary judgment on the other's claims. The trial judge, ruling that neither Welsh nor the McNeils had standing to maintain their claims, granted both motions.

Welsh rested his standing to sue the McNeils on a provision in the Bylaws of the Homeowners Association giving individual members the "same rights as the Association" to enforce the Bylaws. After he initiated his suit, however, the Association, through the actions of its Board of Directors and its President, approved the McNeils' lease. Welsh contends this approval was itself improper under the Bylaws. Even if that is so, however, I agree with the trial judge that the approval operated to deprive Welsh of any standing he had to pursue the claim he asserted against the McNeils; under the circumstances, as I explain below, the Bylaw provision on which Welsh relies for standing is inapplicable. I would therefore affirm the award of summary judgment in their favor on Welsh's complaint.

As to the counterclaims, the trial judge ruled that Welsh could not be liable to the McNeils under the Fair Housing and Human Rights Acts because "as a single board member, [he] does not have the power, on his own accord, to grant or deny a reasonable accommodation" to them. We, as a panel, conclude that this was an erroneous basis on which to find either that the McNeils lacked standing or that they could not prevail on the merits of their fair housing claims against Welsh. We therefore reverse the award of summary judgment to Welsh on the McNeils' counterclaims.

**I.**

Chaplin Woods Townhomes is a residential community situated on Texas Avenue in the Southeast quadrant of the District of Columbia. Welsh and the McNeils own homes in this community. All Chaplin Woods homeowners are members of the Homeowners Association and governed by its Bylaws. The Association is a District of Columbia corporation. As its Bylaws set forth, a five-member Board of Directors is vested with "all of the powers and duties necessary for the administration of the affairs of the Association and may do all acts that are not prohibited by these Bylaws." Welsh was a member of the Board; at times pertinent to this case, he served as its Secretary. The Board elects the officers of the Association. The President presides at all meetings of the Association and the Board of Directors and has "all of the general powers and duties which are incident to the chief executive of a stock corporation organized under the Business Corporation Act of the District of Columbia."

The Bylaws permit members to lease their townhouses subject to certain conditions and Board approval. The conditions include a rule against occupation of the premises by anyone not named in the lease and a prohibition of subletting. However, by a two-thirds vote, the Board of Directors may approve leases that do

not meet those or other Bylaw requirements. If the Board does not approve a lease, it "may pursue the legal remedies at its disposal in order to prevent the unauthorized use of the premises."

In general, "the Association, acting through its Board of Directors," may seek legal relief for any violation of the Bylaws. An "aggrieved Member" of the Homeowners Association also is authorized by the Bylaws to seek such relief "if appropriate." The Bylaws further state that "[a]ny individual Member shall have the same rights as the Association to enforce any provision of these Bylaws except the right to collect delinquent assessments."

In April 2009, the McNeils started renting their townhouse in Chaplin Woods to an entity identified as "Oxford House – Texas Avenue." This entity was an unincorporated association of approximately seven women who were recovering alcoholics and drug addicts. The purpose of the lease was to provide them with sober, supportive, single-family housing in accordance with the tenets of a recovery program sponsored by a national organization known as Oxford House,

Inc.[3]  The lease was for two years.  It was renewed for another two-year term in

June 2011.

---

[3]  Oxford House, Inc., is a not-for-profit, tax-exempt corporation that assists in the establishment of housing for recovering alcoholics and substance abusers.  It acts as an "umbrella organization" for a national network of independent group homes.  *Oxford House, Inc. v. Cherry Hill*, 799 F. Supp. 450, 452 (D. N.J. 1992); *see also Tsombanidis v. City of W. Haven*, 180 F. Supp. 2d 262, 272 (D. Conn. 2001), *aff'd in part, rev'd in part sub nom. Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003).  "Oxford Houses," as the group homes are called, have been described as follows:

> Oxford Houses are not health care facilities, rehabilitation centers, or supervised halfway houses. They are simply residential dwellings rented by a group of individuals who are recovering from alcoholism and drug addiction.  Three basic rules govern the functioning of all Oxford Houses: each house must 1) be democratically self-governed by its residents, 2) be financially self-supporting, and 3) immediately expel any resident who relapses into drug and/or alcohol use.  No professional treatment, therapy, or paid staff is provided. Unlike a boarding house, where a proprietor is responsible to run and operate the premises, at Oxford House, the residents are responsible for their own food and care as well as for running the home.  Because the house must be self-supporting, each of the residents needs a source of income to pay his or her fair share of the expenses.

*Oxford House, Inc.*, 799 F. Supp. at 452.  A guiding principle of the program is to locate Oxford Houses in "clean, drug-free, single family neighborhoods that will provide the occupants a sense of pride and self-worth," on the premise that this "plays a crucial role in an individual's recovery by promoting self-esteem, helping to create an incentive not to relapse, and avoiding the temptations that the presence of drug trafficking can create."  *Id.* at 453.

The two leases did not comply with the Homeowners Association Bylaws, chiefly because they did not name the persons who would occupy the premises. The Board of Directors did not approve the leases. However, neither the Board nor Welsh took legal action to abate the unapproved tenancy while either lease was in effect.

In May of 2013, as the second lease was soon to expire, the President of the Board of Directors informed the McNeils in writing that they would have to submit a lease that complied with the Bylaws. The following month, the General Counsel of Oxford House, Inc., wrote a letter to the Board. Stating that he was writing on behalf of both the McNeils and the residents of Oxford House – Texas Avenue, he requested that the Board waive the Bylaw requirements at issue as a reasonable accommodation mandated by the Fair Housing Act to afford persons recovering from substance abuse who could not live independently or with their families "an equal opportunity to use and enjoy a single[-]family dwelling of their choice." The Board took no immediate action in response to this letter.

The McNeils proceeded to enter into another lease with Oxford House – Texas Avenue. They submitted this lease to the Board for its approval in August 2013. The Board rejected the lease for being non-compliant with the Bylaws. This

time, however, the Board turned the matter over to the Homeowners Association's attorney. In September 2013, that attorney sent the McNeils a "Notice of Violation – Cease and Desist" letter asserting they were violating the Bylaws by subleasing their townhouse and allowing persons not named in the lease to occupy it.[4] The letter called upon the McNeils to cure this violation within ten days and warned that their failure to cease subletting the property "may result in the Association exercising its available remedies at law," including removal of the tenants from the premises, the imposition of fines, the filing of a civil lawsuit, and other possible sanctions.

The General Counsel of Oxford House, Inc., answered the cease-and-desist notice on the McNeils' behalf. Citing his June 2013 request for a reasonable accommodation, he charged that the Association's conduct up to this point had violated the fair housing rights of both the McNeils and the Oxford House – Texas Avenue residents. He warned that if the Association did not grant a reasonable accommodation to enable them to proceed with their lease, the McNeils would apply for a court order enjoining enforcement of the Bylaws against them.

---

[4] "Specifically," the letter stated, "we understand that you have leased your Property to Oxford House – Texas Avenue . . . [which] has in turn subleased the Property to at least seven (7) individuals . . . for some type of halfway house or recovery home."

The Association's attorney responded that he had not known of the McNeils' request for a reasonable accommodation and would review it with the Board of Directors. On January 9, 2014, he sent the Board a letter advising that the accommodation sought by the McNeils would be "appropriate" and "required" under the Fair Housing Act and recommending that the full Board of Directors meet to discuss the issue.[5]

Two weeks later, on January 24, 2014, Welsh filed his complaint against the McNeils to enjoin them from leasing their townhouse in violation of the Homeowners Association Bylaws.[6] The Board of Directors did not authorize this action and the Association did not participate in it. Welsh brought the suit in his own name, citing the Bylaw provisions empowering individual members of the Association to enforce the Bylaws. In their answer, the McNeils asserted that Welsh lacked standing to maintain the action. They also counterclaimed, charging Welsh with discriminating against the residents of Oxford House – Texas Avenue in violation of the Fair Housing and Human Rights Acts, principally by ignoring,

---

[5] The letter is marked as a privileged attorney-client communication, but the privilege apparently has been waived, as the letter was produced in discovery and is part of the record on appeal.

[6] In addition to equitable relief, the complaint prayed for attorneys' fees and asserted that Welsh was entitled to unspecified damages.

opposing, and obstructing their request for a reasonable accommodation. The McNeils claimed, among other things, that when they attempted to educate Welsh about their tenants' need for an accommodation, he refused to accept their explanations, and that he impeded and delayed consideration of their request for a reasonable accommodation by failing to bring the June 2013 letter from the General Counsel of Oxford House, Inc., to the attention of the Association's attorney (as allegedly it was Welsh's responsibility to do in his capacity as the Board's Secretary).[7] The McNeils further claimed that Welsh had retaliated against them in contravention of the Fair Housing and Human Rights Acts by threatening and thereafter pursuing legal action against them for not complying with the Bylaws. In response to the counterclaims, Welsh denied that his actions were discriminatory or retaliatory. He claimed to have acted solely in the belief that enforcement of the Bylaws is necessary to protect important legitimate interests of the Homeowners Association.

On April 28, 2014, shortly after the McNeils responded to the complaint, the President of the Homeowners Association sent them a letter on Association

---

[7] Welsh claims he did not forward the letter because he did not know whether its author was representing the McNeils. He also points out that the full Board was aware of the request because the Oxford House's General Counsel sent his letter to all Board members.

stationery. The letter advised the McNeils that the Board of Directors had voted on March 27, 2014, on a motion to approve their lease with Oxford House – Texas Avenue. According to the letter, four of the five Directors were present at the meeting, including Welsh, and "[t]he vote was 2 yes, 1 nay and 1 excused."[8] "Therefore," the letter concluded, "the lease was approved[.]" So far as the record indicates, the Board of Directors has never disavowed this letter from its presiding officer. The Association has not sought to intervene in the present lawsuit to enforce the Bylaws against the McNeils' lease.

After they received the President's letter, the McNeils requested that Welsh dismiss his complaint. He refused to do so, taking the position that the Board vote on March 27 did not constitute an approval of the lease because only two Directors voted for approval. Welsh claimed that because there were four Directors present (though only three voted), a valid approval would have required three affirmative votes under a Bylaw provision stating that "the vote of *a majority of the Directors present* at a meeting at which a quorum is present shall constitute the decision of

---

[8] In an interrogatory answer in this case, Welsh stated that he "abstained from the vote because of [his] perceived conflict of interest" arising from the fact that he had sued the McNeils.

the Board of Directors" (emphasis added).[9] Welsh also claimed that the Board

vote was ineffective because the Board previously had disapproved the lease and

because the McNeils did not obtain the Board's approval of it before the lease term

commenced. The McNeils contend that Welsh's continuing prosecution of his suit

against them after the Board's approval of their lease constitutes further retaliation

in violation of the fair housing laws. Welsh denies this.

The parties eventually filed motions for summary judgment on the claims

asserted against them. As we shall explain below, the trial judge granted both

motions on the ground that neither Welsh nor the McNeils had standing to bring

their respective claims.

## II.

Appellate review of a grant of summary judgment is *de novo*.[10] We will

affirm if the record shows there is no genuine issue of material fact and the movant

---

[9] We note that there may be a genuine, unresolved dispute as to the number of Directors present when the vote was taken: Welsh claims he was present, but the President's letter states that the fourth Director was "excused."

[10] *Johnson v. Wash. Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015).

is entitled to judgment as a matter of law.[11]  In conducting our review, we construe the record "in the light most favorable to the non-moving party"; however, "mere conclusory allegations by the non-moving party are legally insufficient" to defeat a facially sufficient motion.[12]  Rather, the opponent of the motion "must produce at least enough evidence to make out a prima facie case in support of [its] position."[13]  Civil Rule 56 "mandates the entry of summary judgment" against a party that has failed to make a sufficient evidentiary showing on an essential element of its case with respect to which it has the burden of proof.[14]

"Standing is a threshold jurisdictional question [that] must be addressed prior to and independent of the merits of a party's claims."[15]  "[T]he question is

---

[11]  Super. Ct. Civ. R. 56 (c); *see, e.g.*, *Virginia Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs. Inc.*, 878 A.2d 1226, 1232-33 (D.C. 2005).

[12]  *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281 (D.C. 2002).

[13]  *Id.* at 1281-82.

[14]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *see, e.g.*, *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1037 (D.C. 2014).

[15]  *Grayson v. AT&T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc) (internal quotation marks omitted).

whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue."[16]  This, too, is an issue of law that is reviewed *de novo*.[17]  When a lawsuit has reached the summary judgment stage and a party's standing is in issue, the requisite "standing must be shown through 'specific facts' set forth 'by affidavit or other evidence' to survive a motion for summary judgment."[18]

Traditionally, we have looked to "federal standing jurisprudence, both constitutional and prudential," for the principles that determine whether a party has standing to pursue a claim for relief.[19]  "Constitutional" standing is grounded in the "case or controversy" language of Article III of the federal Constitution.  The *sine qua non* of constitutional standing is the requirement that the claimant have such a "personal stake in the outcome of the controversy" as to justify calling upon the

---

[16]  *Id.* (internal quotation marks omitted).

[17]  *Parcel One Phase One Assocs. L.L.P. v. Museum Sq. Tenants Ass'n*, 146 A.3d 394, 398 (D.C. 2016).

[18] *Grayson*, 15 A.3d at 246 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

[19]  *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002) (internal quotation marks omitted); *see also Grayson*, 15 A.3d at 233-34.

remedial powers of the court.[20]  "A party has such a 'personal stake' only if:  (1) he or she has suffered 'injury in fact' – an actual or imminent, concrete and particularized, invasion of a legally protected interest; (2) the injury is 'fairly . . . trace[able]' to [the] defendant's challenged actions; and (3) it is 'likely . . . the injury will be redressed by a favorable decision.'"[21]

In addition to those requirements, we also adhere to "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"[22]  Unlike the constitutional standing requirements, this prohibition usually is viewed as a "prudential" limitation on standing.[23]  As such, although it is a requirement of

---

[20]  *Grayson*, 15 A.3d at 229 n.19 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

[21]  *Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) (quoting *Lujan*, 504 U.S. at 560-61); *accord Grayson*, 15 A.3d at 246; *Friends of Tilden Park*, 806 A.2d at 1206-07.

[22]  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth*, 422 U.S. at 499).  The Supreme Court has recognized an exception to the rule against third-party standing where the party seeking to assert the right of another has a "close" relationship with the person who possesses the right and there is a "hindrance" to the possessor's ability to protect his own interests.  *Id.* at 130.

[23]  *But see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014) (describing third-party standing limitations as "hard[] to classify" and leaving consideration of their "proper place in the standing

*(continued…)*

general applicability, it does not apply to claims for relief brought under statutes that provide otherwise. The Federal Fair Housing Act and the District of Columbia Human Rights Act are two such statutes; standing to sue under them has been held to be co-extensive with standing under Article III of the Constitution.[24]

Standing ordinarily must persist throughout the litigation.[25] This implicates the related concept of mootness: "the doctrine of standing set in a time frame," in that "[t]he requisite personal interest that must exist at the commencement of the

---

*(continued…)*
firmament" to "another day"). Other non-constitutional limitations on standing have been identified; *Lexmark* indicates that labeling them as "prudential" may be questionable. *See* 134 S. Ct. at 1387. For present purposes, it is unnecessary to consider these other limitations.

[24] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (holding that standing to maintain a civil action under the Fair Housing Act "extend[s] to the full limits of Art. III and that the courts accordingly lack the authority to create prudential barriers to standing" in suits brought under that Act; "[t]hus the sole requirement for standing to sue under [the Fair Housing Act] is the Art. III minima of injury in fact") (internal quotation marks omitted); *Equal Rights Ctr.*, 110 A.3d at 603 ("We have recognized, several times, that the DCHRA presents no additional prudential barriers.") (citing *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 733 (D.C. 2000); *Molovinsky v. Fair Emp't Council of Greater Washington*, 683 A.2d 142, 146 (D.C. 1996)).

[25] *See, e.g.*, *Kamit Inst. for Magnificent Achievers v. District of Columbia Public Charter School Bd.*, 81 A.3d 1282, 1286-87 (D.C. 2013) ("[I]t is not enough that Kamit may have had standing . . . at the outset of this litigation, or even when it noted its appeals . . . . The requisites of standing must continue to be met as long as the appeals continue.").

litigation (standing) must continue throughout its existence (mootness)."[26]   An

action becomes moot, and the plaintiff thereby loses his standing to continue to

maintain it, "when the issues presented are no longer 'live' or the parties lack 'a

legally cognizable interest in the outcome.'"[27]   Mootness, like standing, is a

question of law that we review *de novo*.[28]

## III.

### A.

Regarding Welsh's claim against the McNeils for leasing their townhouse in

violation of the Bylaws, the trial judge ruled that because the Board of Directors

---

[26]   *Rotunda v. Marriott Int'l, Inc.*, 123 A.3d 980, 983 (D.C. 2015) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)).   While "[l]ack of standing always deprives a court of the power to adjudicate a claim, . . . the doctrine of mootness is subject to recognized exceptions that allow a court to proceed to judgment." *Mallof v. District of Columbia Bd. of Elections & Ethics*, 1 A.3d 383, 395 n.54 (D.C. 2010); *see also Grayson v. AT&T Corp.*, 15 A.3d 219, 235 n.38 (D.C. 2011).   However, the exceptions this court has recognized, such as "for disputes capable of repetition yet evading review," *Mallof*, 1 A.3d at 395, are not pertinent here.

[27]   *Settlemire v. District of Columbia Office of Emp. Appeals*, 898 A.2d 902, 904-05 (D.C. 2006) (citations omitted).

[28]   *Fraternal Order of Police, Metro. Labor Comm. v. District of Columbia*, 82 A.3d 803, 814 (D.C. 2014).

approved the McNeils' lease after Welsh commenced his lawsuit, a dispute no longer existed for the court to resolve. The judge found no legal support for the proposition that an individual homeowner could challenge the decision of a homeowners association in court without suing the association itself or its Board of Directors.

Welsh contends that the judge erred by relying on the mistaken (or at least disputed) premise that the Board validly approved the McNeils' lease. The trial judge did not address the validity of the Board's putative approval. I would conclude, however, that it was not necessary for the judge to address this issue in order to rule, correctly, that Welsh lost his standing to sue the McNeils directly once the Association approved their lease.

Welsh did have standing to sue the McNeils for violating the Association's Bylaws when he commenced his action against them in January 2014. Ordinarily, a homeowners association has the primary responsibility of enforcing its rules and regulations for the good of the entire community; such communal enforcement has been recognized as "one of the chief benefits of owning property in a common-

interest community" and a "chief function" of the association.[29]  Nevertheless, except where governing documents or statutes provide otherwise, it is the general rule that individual members of a homeowners association also may sue to enforce the association's bylaws.[30]  That general rule is incorporated in the Bylaws on which Welsh relies for standing to sue the McNeils.  Those Bylaws state that individual homeowners have "the same rights as the Association to enforce any provision of these Bylaws except the right to collect delinquent assessments," and that an "aggrieved" homeowner may seek legal relief for a violation of the Bylaws "if appropriate."

Shared power to enforce the bylaws permits homeowners to act on violations when the homeowners association fails to do so.[31]  The need for individual

---

[29]  RESTATEMENT (THIRD) OF PROPERTY:  SERVITUDES § 6.8, cmt. a (2000).

[30]  *See id.*; 15B AM. JUR. 2d *Condominiums & Cooperative Apartments* § 55 (2017) ("An individual unit owner also has standing to bring a claim against another unit owner for a breach of the condominium bylaws, even though the unit owners agreed to allow the condominium board to sue on their behalf for certain matters, as the board's right is not exclusive of the unit owners' rights to pursue legal remedies for individual wrongs.").

[31]  *See Williams v. Southern Trace Prop. Owners Ass'n*, 981 So. 2d 196 (La. Ct. App. 2008) (upholding association's discretion not to enforce restrictions and covenants against minor infractions because "practicality and economy prohibit the enforcement of every violation" and "some violations may be more irritating to one owner than to another and may be deemed not actionable by the majority";

*(continued…)*

enforcement action typically arises when (unlike in the present case) the homeowner's claim is against the association itself[32] or the homeowner seeks a remedy for injury to his own personal property rather than a common injury.[33]

The issue in this case is not whether Welsh had standing to sue the McNeils when he commenced his lawsuit. The issue is whether Welsh continued to have standing to pursue the suit after the President of the Association informed the McNeils that the Association had approved their lease – or whether, in other words, Welsh's complaint thereupon became moot.

---

*(continued…)*
adding, in *dictum*, that each property owner "has the individual right to seek enforcement of the restrictions and covenants if the Association in its discretion and judgment declines to act to the satisfaction of the property owner").

[32] *See St. Denis v. Queensbury Baybridge Homeowners Ass'n*, 955 N.Y.S.2d 263, 264-65 (App. Div. 2012) (holding that an individual homeowner had standing to sue the association for amending its budget and raising monthly dues, to the homeowner's detriment, in violation of the association's declaration and bylaws) (citing cases).

[33] *See, e.g.*, *Kirschner v. Baldwin*, 988 So. 2d 1138, 1141-42 (Fla. Dist. Ct. App. 2008) (holding that property owner had standing to seek injunction and monetary relief in suit against neighbor for constructing garage too close to her property, in violation of setback restriction, and that the failure of the property owners' association to enforce the restriction did not bar the suit); *Uehara v. Schlade*, 603 N.E.2d 646, 650 (Ill. App. Ct. 1992) (holding that condominium unit owner had standing to sue owner of neighboring unit for fire-related damages to her condominium caused by neighbor's violation of maintenance requirements in condominium bylaws).

Shared power to enforce an association's bylaws becomes problematic when the parties who share the enforcement power disagree over whether it should be exercised. I am not aware of a case in which one member of a homeowners association was allowed to enforce a bylaw against another member over the association's objection, i.e., contrary to a decision by the association not simply to refrain from enforcing the bylaw itself but to waive it and permit or excuse the alleged violation. It is one thing for a homeowner to enforce the bylaws when the association is unable, unwilling, or too busy to expend the time and effort to do so itself; mere inaction by the association does not foreclose the homeowner's enforcement action because it does not actually conflict with the association's decision. It is quite another thing when the association, representing all its members, *does* act and opts to resolve the dispute differently, without enforcement of the bylaws. Generally speaking, a homeowners association has the power to release or compromise any claim it has the right to assert, and to do so over the objections of individual homeowners, who then are bound by the association's resolution of the claim.[34]

---

[34]  *See Frantz v. CBI Fairmac Corp.*, 331 S.E.2d 390, 395 (Va. 1985) (holding that "because a unit owners' association has the authority . . . to assert a claim for the violation of a common right, it necessarily has the authority to compromise the claim" over the objection of individual unit holders, all of whom

*(continued…)*

Although the Bylaws in this case recognize an individual homeowner's right to sue for a violation of the Bylaws, their phrasing – that a homeowner has "the same rights as the Association to enforce" the Bylaws and may seek legal relief "if appropriate" – supports the view that the Association can foreclose such a lawsuit by resolving the claim itself. If the Association has waived its right to enforce a Bylaw, a homeowner who has only "the same rights as the Association" has no right to enforce it either. The Bylaw does not give individual homeowners superior or additional enforcement rights. It would be unreasonable to read the provision as empowering a Member to enforce a Bylaw that the Association has waived, for a Member's exercise of such an override power would interfere with the Association's ability to manage its affairs and represent the common interests

---

*(continued…)*
are "bound by the compromise"); *Golub v. Milpo, Inc.*, 522 N.E.2d 954, 957-58 (Mass. 1988) (explaining that association's power to conduct litigation relating to common areas and facilities "includes the power to settle claims prior to or in the course of litigation" on behalf of the unit owners). I do not suggest, however, that a homeowner's association may release or compromise an individual member's claim against a third party for damages to the member's personal property (as opposed to the common elements). *See id.* (holding that association has "no authority to settle claims for damages to individual units"); *Siller v. Hartz Mountain Assocs.*, 461 A.2d 568, 574 (N.J. 1983) ("The unit owner, of course, does have primary rights to safeguard his interests in the unit he owns. . . . The unit owner's right to maintain an action for compensation for that loss against the wrongdoer is not extinguished or abridged by the association's exclusive right to seek compensation for damage to the common element."). Nor do I mean to suggest that the association can unilaterally compromise a homeowner's claim against the association itself (or the members of its governing body) for violation of the bylaws, breach of fiduciary duty, or other misconduct. *See id.*

of its Members, and it would threaten the reasonable expectations and legal rights of parties dealing with the Association and relying on its decisions. The words "if appropriate" also suggest a limitation on the individual Member's right to seek legal relief for a violation of the Bylaws; although the nature of that limitation is not spelled out, at least one court has understood similar words ("in any proper case") to mean that an association's decision to surrender a claim held in common by all its members precludes an individual member from pursuing the claim directly against the alleged violator.[35]

The Association's waiver of a right held in common would not necessarily bar a homeowner from pursuing a claim based on a different legal right or for an individual (as opposed to common) injury such as damage to the homeowner's personal unit or property. In this case, though, Welsh does not contend that he is asserting any right other than the same legal right the Association possessed to enforce the Bylaws against the McNeils for the common welfare of the Membership. The interest Welsh claims to have at stake is simply his interest in the enforcement of the Bylaws for the good of the Association as a whole, an

---

[35]  *See Frantz*, 331 S.E.2d at 395.  As we discuss below, this does not necessarily mean the individual aggrieved homeowner is without other recourse to rectify the association's wrongful failure to enforce the Bylaws or pursue a valid claim.

interest he shares in common with all other homeowners. Thus, in his complaint, Welsh described the harm allegedly caused or threatened by the McNeils as follows:

> Plaintiff and the Association have suffered damages as a result of Defendants' violation. The Association has valid reasons to require members to provide names of the tenants and to prohibit terms of less than 1 year. Such provisions are essential to the orderly management of the Association and to preserve the financial viability of the Association. Compliance with rules is necessary to collect HOA [Homeowners Association] fees in the event of a member default, or assessments in the event of a violation of bylaws.

Despite his *pro forma* request for monetary damages, Welsh did not and still does not claim to have been injured directly and personally by the McNeils' lease of their townhouse to Oxford House – Texas Avenue. At no point in this entire litigation – not in his complaint, nor at the summary judgment stage, nor even on appeal – has Welsh been able to identify any personal injury for which a court could award him monetary relief.[36] Merely pleading that one is entitled to

---

[36] Although Welsh has argued that the Association could have been entitled to damages based on a fine schedule promulgated by the Board pursuant to the Bylaws, those would be the Association's damages, not Welsh's. Moreover, the Board never assessed any fines against the McNeils and, even if the Board had done so, the Bylaws specifically withhold from Welsh "the right to collect delinquent assessments."

unspecified monetary damages, without identifying an injury they would redress, is not enough to show personal standing.[37] By the summary judgment stage at the latest, when he faced a direct challenge to his standing, it was Welsh's burden to proffer evidence of a personal injury on which he predicated his claim for recoverable damages.[38] He did not do so.

At oral argument in this appeal, the court inquired as to what monetary damages Welsh hoped to recover. His counsel responded that Welsh seeks to be compensated for his attorney's fees and costs (including the value of his own time) incurred in prosecuting this litigation against the McNeils. Welsh contends that his expectation of being awarded attorney's fees and costs pursuant to the Bylaws if he prevails on his claim against the McNeils suffices by itself to support his standing to pursue the litigation. But that is not so. "[A] party's interest in pursuing

---

[37] *See Davis v. Dyson*, 900 N.E.2d 698, 712 (Ill. App. Ct. 2008) ("[A]n owner of a condominium unit has no standing to maintain an action in his own right where the alleged injury is inflicted upon the condominium association and the only injury to the unit owner is the indirect harm that consists in the lessening of value of his unit.").

[38] *See Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. 2008) ("While we examine the evidence in the light most favorable to the party opposing the motion, '[c]onclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment.'") (quoting *Hollins v. Federal National Mortgage Ass'n,* 760 A.2d 563, 570 (D.C. 2000)).

litigation in order to be awarded attorney's fees [and costs] cannot by itself create the requisite live controversy 'where none exists on the merits of the underlying claim.'"[39]

Welsh implicitly concedes that his claim against the McNeils would be moot if the Association's Board of Directors properly approved their lease. Welsh's argument is that the Board vote was not a valid approval, in spite of the representation in the President's letter to the McNeils, and that the Association therefore did not waive its right to enforce the Bylaws against the McNeils. Consequently, Welsh concludes, the Association did not preclude him from continuing his individual suit to enforce the Bylaws and stop the McNeils from leasing their townhouse to Oxford House – Texas Avenue. But whether the Board validly approved the lease or not, the President's letter to the McNeils said it did. In my view, the letter from the President effected a legally binding relinquishment by the Association of its right to enforce the Bylaws against the McNeils on account of their lease.

---

[39] *Settlemire v. District of Columbia Office of Emp. Appeals*, 898 A.2d 902, 907 (D.C. 2006) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480 (1990)).

The Association is a corporate body, and the conclusion that it waived its rights rests on principles of corporation law that are well established. A corporation "can only act by agents, and its duly elected officers are[,] within the scope of their respective duties, its agents to deal with third parties."[40] Like any corporation, the Association therefore is "bound by the acts of its officers so long as they act with either actual or apparent authority."[41] And even when an officer

---

[40] *Russell v. Washington Sav. Bank*, 23 App. D.C. 398, 407 (D.C. Cir. 1904); *cf. Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 239 (D.C. 2006) ("[A]s all corporations must necessarily act through agents, a wholly owned subsidiary may be an agent and when its activities as an agent are of such a character as to amount to doing business of the parent, the parent is subjected to the in personam jurisdiction of the state in which the activities occurred.") (quoting *Curtis Publishing Co. v. Cassel,* 302 F.2d 132, 137 (10th Cir. 1962)); *Dean v. Walker*, 876 F. Supp. 2d 10, 13 (D.D.C. 2012) (relying on the proposition that when a corporation's CEO signs a contract with a third party, he is acting on behalf of the corporation); *BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997) ("Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization.") (quoting *FDIC v. Ernst & Young*, 967 F.2d 166, 171 (5th Cir. 1992)).

[41] *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 7 (D.D.C. 1997), *aff'd,* 159 F.3d 636 (D.C. Cir. 1998) (holding corporation bound by contract executed by its president without the required authorization of the board of directors); *see also, e.g., Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers.") (quoting 2 W. Fletcher, Cyclopedia of Law of Private Corporations § 466 at 505 (rev. ed. 1990)); *Shear v. National Rifle Ass'n*, 606 F.2d 1251, 1254 (D.C. Cir. 1979) (holding that despite the board's lack of authority to approve a

*(continued…)*

acts without actual or apparent authority, the corporation still may be bound if it fails to disaffirm the action within a reasonable time after learning of it; ratification is implied.[42]

In the present case, even if the President was mistaken about the meaning and validity of the Board's March 27 vote (a matter on which we do not opine), he acted in his official capacity and within the ordinary scope of his duties under the Bylaws as the chief executive officer and presiding Director of the Association in communicating with the McNeils about the Board's decision regarding their

---

*(continued…)*

contract, the corporation may be bound by it if the president possessed apparent authority to sign it); *Russell*, 23 App. D.C. at 407 ("[I]n the absence of specific limitations brought home to the knowledge of those who deal with them, or of which those who deal with them are bound to take notice, the officers of a corporation, as its agents, are authorized to bind the corporation to third parties so long as they act within the ordinary scope of their duties.").

[42] *Capital Food Mart, Inc. v. Sam Blanken & Co.*, 267 A.2d 371, 373 (D.C. 1970) (holding that although the corporate treasurer had no authority to execute a listing agreement to sell its business, the corporation impliedly ratified the agreement and was bound by it because it knew of the agreement and took no steps to prevent or repudiate it); *Columbia Hosp.*, 15 F. Supp. 2d at 9 ("The District of Columbia Court of Appeals has held that for an unauthorized act to be ratified, the principal must have knowledge of the act and may ratify the act impliedly, but the conduct that implies ratification must be conduct that is 'inconsistent with any other hypothesis.'") (quoting *Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 671-72 (D.C. 1983)); *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 465 (D.C. Cir. 1989).

lease.[43] If the President did not have actual authority to declare the McNeils' lease approved, he had apparent authority to do so based on his official position, the surrounding circumstances, and the Bylaws.[44] Welsh does not claim, and nothing in the record suggests, that it was unreasonable for the McNeils to believe the Board had approved their lease and had authorized the President to convey that decision to them. In addition to the indicia of apparent authority already

---

[43] The President's action was not *ultra vires*. As the court explained in *Columbia Hospital*,

> Ultra vires doctrine encompasses only corporate actions that are expressly prohibited by statute or by-law. Commentators have noted that though ultra vires acts are sometimes confused with . . . acts within the power of the corporation but exercised . . . without complying with required procedures . . . , in its true sense the phrase ultra vires describes action which is beyond the purpose or power of the corporation.

*Columbia Hosp.*, 15 F. Supp. 2d at 7 (internal quotation marks, brackets, and citation omitted). Accordingly, here as in that case, "[n]ot ultra vires, but the law of *agency*, governs [the plaintiff's] claim." *Id.* (emphasis in original).

[44] "Apparent authority arises when a principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold. Apparent authority thus may exist without the principal's express authorization of the agent's representations or conduct[.]" *Green Leaves Rest., Inc. v. 617 H St. Assocs.*, 974 A.2d 222, 230 (D.C. 2009) (internal quotation marks and brackets omitted). *See also Columbia Hosp.*, 15 F. Supp. 2d at 8 ("Moreover, at least one court has found that where a corporation appoints someone to act as 'chief executive officer and chairman of the board . . . [a]ppointing a person to such a position may, in itself, create apparent authority in an employee.'") (quoting *Federal Deposit Ins. Corp. v. Texas Bank of Garland*, 783 S.W.2d 604, 607 (Tex. Ct. App. 1989)).

mentioned, the President of the Association owed fiduciary duties to its members, including the McNeils.[45] It is axiomatic that "it is reasonable for a person to act upon the representations of a speaker who owes the listener a fiduciary duty."[46] Moreover, the Board of Directors did not join the present litigation against the McNeils and never repudiated the approval of the McNeils' lease. The Board's inaction in that regard reinforced the reasonableness of the McNeils' reliance on the President's communication and amounted to an implicit ratification of the President's letter.

The Association is therefore bound by the action of its President to treat the McNeils' lease as having been approved in accordance with the Bylaws. The approval amounted to a waiver of the Association's claim against the McNeils for leasing their townhouse in violation of the Bylaws. As I have explained, this

---

[45] *See Willens v. 2720 Wisconsin Ave. Co-op. Ass'n,* 844 A.2d 1126, 1136 (D.C. 2004) ("The directors of the Cooperative owed the duties of a fiduciary to the corporation and to its members.") (citing *Wisconsin Ave. Assocs. v. 2720 Wisconsin Ave. Coop. Ass'n,* 441 A.2d 956, 962-63 (D.C. 1982)); *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 14 N.E.3d 540, 550 (Ill. App. Ct. 2014) ("The individual members of the board of managers of a condominium association owe a fiduciary duty to the unit owners.").

[46] *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 961 F. Supp. 305, 310 (D.D.C. 1997); *see, e.g., Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 934 (D.C. 1992).

waiver binds not only the Association, but also its individual Members, including Welsh.

Welsh argues that even if the Association is deemed to have approved the McNeils' most recent lease, it did not approve their two previous leases with Oxford House – Texas Avenue, and therefore he still may enforce the Bylaws with respect to them. But those leases expired before Welsh brought this lawsuit, and he has identified no lingering adverse consequences, nor any threat of future harm posed by them, nor any compensable injury he sustained on account of them. Moreover, while the Association perhaps could have assessed fines against the McNeils because of the expired leases, it did not do so; nor, as previously noted, does Welsh have the right under the Bylaws to sue to collect unpaid fines from the McNeils. Consequently, even if the Association retains a theoretical right to enforce the Bylaws with respect to the expired leases (which seems highly doubtful given the Association's ultimate approval of the most recent lease), there is no effective relief the court now can provide Welsh for the McNeils' alleged violation

of the Bylaws – there is nothing for the court to enjoin and no monetary damages to award him – so the third, redressability, condition of standing is not satisfied.[47]

The preceding analysis does not necessarily mean a homeowner such as Welsh is without any viable remedy when the management of the homeowners association wrongly refuses to bring suit or otherwise enforce the bylaws. Although a plaintiff usually has standing to assert only his "own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,"[48] the homeowner may be able to pursue a derivative action in the association's name to enforce the association's rights.[49] In order to do so, however, the homeowner must satisfy the conditions precedent for the maintenance

---

[47] *See, e.g.*, *Equal Rights Ctr. v. Properties Int'l*, 110 A.3d 599, 603 (D.C. 2015) (explaining that the redressability condition of standing means that "a plaintiff seeking forward-looking relief, such as an injunction, must allege facts showing that the injunction is necessary to prevent injury otherwise likely to happen in the future"); *Thorn v. Walker*, 912 A.2d 1192, 1195-97 (D.C. 2006) (holding that sale of property mooted appeal of judgment for specific performance of purchase agreement).

[48] *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

[49] *See, e.g.*, *Cigal v. Leader Dev. Corp.*, 557 N.E.2d 1119, 1122-23 (Mass. 1990) (individual unit owners cannot assert claims of condominium association except by way of a derivative suit); *Siller v. Hartz Mountain Assocs.*, 461 A.2d 568, 574-75 (N.J. 1983) (when a unit owner sues on a common element claim because of the association's failure to do so, "the unit owner's claim should be considered derivative in nature and the association must be named as a party").

of such actions, including the demand requirement.[50] In the present case, Welsh did not pursue relief through the vehicle of a derivative action; he did not claim to have made a demand on the Board of Directors, that it would have been futile to do so, or that the Board's failure to sue the McNeils was in bad faith, unreasonable, or attributable to any reason other than the exercise of a good faith business judgment (on the advice of counsel, as it appears).

I would, therefore, conclude that the trial court properly dismissed Welsh's complaint against the McNeils for lack of standing or, more precisely, for mootness.

---

[50] A shareholder (or a member of a non-profit corporation) seeking to bring a derivative enforcement action "must first demonstrate to the court either that the corporation refused to proceed after a suitable demand for action or that a demand would be futile." *Behradrezaee v. Dashtara*, 910 A.2d 349, 354-55 (D.C. 2006). Generally, moreover, shareholders are prohibited from "initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of California v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990); *see, e.g.*, *Goldberg v. Michael*, 766 N.E.2d 246, 251 (Ill. App. Ct. 2002) (holding that individual homeowners could not pursue litigation derivatively on behalf of their homeowners association when the board had voted not to proceed with litigation, without a showing that the board "abused its discretion, was grossly negligent, or acted in bad faith or fraudulently").

**B.**

In awarding summary judgment to Welsh on the McNeils' counterclaims, the trial judge reasoned that a tenant suing his landlord under the fair housing laws for the denial of a reasonable accommodation must show that (1) he suffered from a disability; (2) the landlord knew or should have known of the disability; (3) an accommodation of the disability is necessary for the tenant to have an equal opportunity to use and enjoy the premises in question; (4) the tenant requested a reasonable accommodation; and (5) the landlord refused to grant a reasonable accommodation.[51] The judge concluded that the McNeils cannot establish the fifth element because Welsh is just one member of a five-member Board of Directors, and "as a single board member, [he] does not have the power, on his own accord, to grant or deny a reasonable accommodation." The same reasoning, the judge stated, applied to the McNeils' retaliation claim. Therefore, the judge held, the McNeils "lack standing" to pursue their Fair Housing Act and Human Rights Act claims against Welsh. We agree with the McNeils that this analysis is faulty.

---

[51] *See Rutland Court Owners, Inc. v. Taylor*, 997 A.2d 706, 711 (D.C. 2010); *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1129 (D.C. 2005) (en banc).

To begin with, it is not a proper standing analysis; it confuses the question of the McNeils' standing with the question of the merits of their fair housing claims. Whether the McNeils can prevail against Welsh despite his position as only one of five board members is an issue concerning the merits of those claims.[52] The McNeils' standing to have their claims adjudicated is a different issue. Because claimants under the Fair Housing and Human Rights Acts need not satisfy any so-called prudential standing requirements, the McNeils need only establish their constitutional standing. Thus, the standing question in this case is only whether – assuming *arguendo* the merits of their legal claims – the McNeils have alleged and can show the minimum Article III requisites of an injury in fact attributable to Welsh for which the court can provide relief.

The trial judge did not address or resolve this threshold question in his ruling. However, on the record before the judge at the summary judgment stage, we see no reason to doubt the McNeils' constitutional standing to pursue their fair housing law counterclaims. Standing to complain of discriminatory housing

---

[52] *See Grayson v. AT&T Corp.,* 15 A.3d 219, 229 (D.C. 2011) ("If a plaintiff's factual allegations are sufficient to require a court to consider whether the plaintiff has a statutory (or otherwise legally protected right), then the . . . standing requirement has served its purpose; and the correctness of the plaintiff's legal theory — his understanding of the statute on which he relies — is a question that goes to the merits of the plaintiff's claim, not the plaintiff's standing to present it.").

practices that violate the Fair Housing and Human Rights Acts is not restricted to the direct targets or victims of such practices, i.e., the persons denied housing on account of their disabilities. Others who suffer or are threatened with "a distinct and palpable injury" from such practices also fall within the category of "aggrieved persons" with standing to sue.[53] Both economic and noneconomic injuries may suffice to provide standing.[54] Thus, it is well-settled that landlords have standing under the Fair Housing and Human Rights Acts to sue those who would prevent them from renting their property to tenants with disabilities.[55]

---

[53] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103 n.9 (1979); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209-10 (1972); *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C. 2000) ("Limiting standing under the DCHRA to only the direct targets of discrimination would limit the flexibility of the DCHRA as a tool to eliminate discrimination and hamstring efforts to effect the statute's broad purpose. That a plaintiff's alleged injury is predicated upon discrimination against a person other than him or herself presents a jury question as to whether an 'unlawful discriminatory practice' occurred and whether the plaintiff was thereby 'aggrieved'; it is not, however, a question of justiciability.")

[54] *Gladstone, Realtors*, 441 U.S. at 112.

[55] *See e.g.*, *Tsombanidis v. City of W. Haven*, 180 F. Supp. 2d 262, 283 (D. Conn. 2001), *aff'd in part, rev'd in part on other grounds sub nom. Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) (holding that the landlord of property rented as a group home for recovering alcoholics and drug addicts had standing to sue city and city fire district on claims that the enforcement of zoning, building, property maintenance, and fire safety codes against the group home discriminated against the residents and prospective residents in violation of the Fair Housing Act and the Americans With Disabilities Act); *Growth Horizons, Inc. v. Delaware Cty., Pa.*, 983 F.2d 1277, 1282 n.6 (3d Cir. 1993) (explaining that an

*(continued…)*

The McNeils fall within that class of plaintiff. They sustained or were imminently threatened with injury sufficient to support standing when the accommodation they requested in order to rent their townhouse in compliance with the Bylaws was withheld, their lease was disapproved, they were directed to cease and desist renting their townhouse to the Oxford House – Texas Avenue tenants or face a lawsuit, and they ultimately were sued by Welsh, all in alleged violation of their and their tenants' rights under the Fair Housing Act and the Human Rights Act. Although there may be a genuine material dispute about Welsh's reasons for opposing the McNeils' lease, there is no dispute that he did oppose it and that his actions could be found to have contributed to causing the aforesaid injuries to the McNeils. If the alleged statutory violations are established, the court can provide appropriate redress in the form of monetary damages in addition to equitable

---

*(continued…)*
"aggrieved person" with standing to sue under the Fair Housing Act "does not necessarily have to be the person discriminated against" and can include an organization providing housing to disabled individuals that claims to have been injured by a discriminatory housing practice); *Dr. Gertrude A. Barber Ctr., Inc. v. Peters Twp.*, 273 F. Supp. 2d 643, 651 (W.D. Pa. 2003) ("Courts have clearly held that a person or company in the business of providing housing for handicapped persons that has been prevented from doing so due to alleged discrimination[] has standing to sue under the [Fair Housing Act]."); *ReMed Recovery Care Ctrs. v. Twp. of Willistown, Chester Cty., Pa.*, 36 F. Supp. 2d 676, 682-83 (E.D. Pa. 1999) (same; citing cases).

relief.[56]

Finally, the mere fact that the McNeils ultimately received the Homeowners Association's approval of their lease did not moot their counterclaims, even with respect to their request for injunctive relief. "For a case to be rendered moot through the defendant's voluntary cessation of a challenged practice, it must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"[57] The party asserting mootness based on the cessation of the challenged conduct has the "heavy burden of persuading the court that the

---

[56] In a private civil action under the Fair Housing Act,

> if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and . . . may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613 (c)(1); *see, e.g., Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234 (D.C. Cir. 1997). The Human Rights Act likewise provides for damages and equitable relief in private civil actions. D.C. Code § 2-1403.16.

[57] *Hardaway v. District of Columbia Hous. Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)); *accord Mbakpuo v. Ekeanyanwu*, 738 A.2d 776, 782-83 (D.C. 1999).

challenged conduct cannot reasonably be expected to start up again."[58]  Welsh, of course, has not asserted mootness on this (or any other) ground; he is in no position to do so given that he has disputed the validity of the Association's approval of the McNeils' lease and has continued to pursue his complaint against the McNeils for violating the Bylaws.

So the question before us is not a standing question.  It is a merits question: whether, as a matter of law, the McNeils cannot succeed on their fair housing claims against Welsh for the reason the trial judge identified – that as a single board member, Welsh did not have the power, "on his own accord," to grant or deny the McNeils' request for a reasonable accommodation or to retaliate against them.  We disagree with the trial judge.  Even assuming the premise that Welsh was powerless to grant or deny a reasonable accommodation by himself,[59] his allegedly discriminatory actions to enforce the Bylaws against the McNeils and block them from leasing their townhouse to Oxford House – Texas Avenue still

---

[58] *Laidlaw Envtl. Servs., Inc.*, 528 U.S. at 189.

[59] On the record before us, the premise is not unassailable.  As Welsh's contention about the Board vote to approve the McNeils' lease indicates, he arguably did have the power to single-handedly deny their accommodation request by refusing to vote for it while remaining present at the time of the vote.  More broadly, he may have influenced the votes of other Board members.

could be found to have violated the Fair Housing Act and the Human Rights Act and to expose him to liability.

Both Acts make it unlawful to discriminate against a person on account of his or her disability (or "handicap") by, *inter alia*, "refus[ing] to make reasonable accommodations in rules, policies, practices, or services [that] may be necessary to afford such [a disabled or 'handicapped'] person equal opportunity to use and enjoy a dwelling."[60] The two Acts also make it unlawful, *inter alia*, to retaliate against any person for exercising or aiding another person to exercise their statutory rights against discrimination.[61] The Acts' prohibitions are not limited to

---

[60] 42 U.S.C. § 3604 (f)(3); D.C. Code § 2-1402.21 (d)(3)(B). A person has a "handicap" within the meaning of the Fair Housing Act if the person has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602 (h)(1). The Human Rights Act employs the term "disability" rather than "handicap," but the two terms have the same meaning. *See* D.C. Code § 2-1401.02 (5A); *see also Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1115 n.1 (D.C. 2005) ("The District of Columbia Human Rights Act employs virtually the same language as that found in the federal Fair Housing Act, substituting the word 'disability' for 'handicap' while incorporating verbatim the federal wording for discrimination based on 'a refusal to make reasonable accommodations' for the disabled.").

[61] *See* 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."); D.C. Code § 2-1402.61 (a) ("It shall be an unlawful discriminatory practice to coerce, threaten,

*(continued…)*

sellers and renters, and they extend to the discriminatory enforcement by third parties of facially neutral land use rules such as homeowners association bylaws.[62]

Accordingly, a failure-to-accommodate claim under the Fair Housing and Human Rights Acts requires proof that (1) the defendant refused (2) a request by or

_(continued…)_
retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.").

[62] _See, e.g._, _Bhogaita v. Altamonte Heights Condo. Ass'n_, 765 F.3d 1277, 1289 (11th Cir. 2014) (affirming judgment that condominium association violated the Fair Housing Act by enforcing its pet weight rule to require resident suffering from post-traumatic stress disorder to remove his emotional support dog from his unit); _Skipper v. Hambleton Meadows Architectural Review Comm._, 996 F. Supp. 478, 484 (D. Md. 1998) ("[T]he use of restrictive covenants or local zoning ordinances to discriminate against handicapped persons violates the FHA irrespective of whether as a matter of state law those covenants or ordinances were violated.") (citing cases); _Martin v. Constance_, 843 F. Supp. 1321, 1326 (E.D. Mo. 1994) ("Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on . . . land use in a manner which discriminates against people with disabilities. Such determination often results from false . . . assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose. These and similar practices would be prohibited." (quoting House Report No. 100-711, 100th Cong., 2d Sess. 24, _reprinted in_ 1988 U.S.C.A.N. 2173, 2184-85)); _Rhodes v. Palmetto Pathway Homes, Inc._, 400 S.E.2d 484, 486 (S.C. 1991) ("We conclude that interpretation of the restrictive covenants in such a way as to prohibit location of a group residence for mentally impaired adults in a community is contrary to public policy as enunciated by both state and federal legislation.").

on behalf of (3) a person suffering from a disability (of which the defendant was or should have been aware) (4) for a reasonable accommodation (5) that may have been necessary to afford the disabled person an equal opportunity to use and enjoy a dwelling.[63] The McNeils proffered such proof in opposition to Welsh's motion for summary judgment.

As recovering alcoholics and addicts, the Oxford House – Texas Avenue tenants of the McNeils could be found to be disabled persons entitled to appropriate accommodations under the Fair Housing and Human Rights Acts.[64] The McNeils requested Welsh and the Board of Directors to approve their lease with Oxford House – Texas Avenue even though the lease did not identify the

---

[63] *See, e.g.*, *Douglas*, 884 A.2d at 1129. It must be shown that the defendant knew or should have known of the disability, but not that the defendant had a discriminatory purpose. *See id.* at 1128-29 (explaining how failure-to-accommodate claims differ from disparate treatment and disparate impact claims). Once the plaintiff produces evidence "sufficient for findings that the requested accommodation is reasonable and may be necessary for enjoyment of the premises equal to that experienced by tenants who are not disabled," the burden shifts to the defendant "to introduce evidence in rebuttal, leaving the ultimate burden of persuasion . . . on the [plaintiff] who seeks accommodation." *Id.* at 1129 (citing *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1156 (9th Cir. 2003)).

[64] Alcoholism and addiction are deemed to be impairments that may render a person disabled or "handicapped." *See, e.g.*, *Douglas*, 884 A.2d at 1129-30; *Oxford House, Inc. v. Cherry Hill*, 799 F. Supp. 450, 459-60 (D.N.J. 1992); 24 C.F.R. 100.201 (a)(2) (2008). The Fair Housing Act provides, however, that the term "handicap" does not include "current, illegal use of or addiction to a controlled substance." 42 U.S.C. § 3602 (h).

tenants by name as the Bylaws required. Although it might be disputed, this could have been a reasonable accommodation to afford the putatively disabled tenants the opportunity to reside in and enjoy the McNeils' townhouse.[65] The request and its justification were presented to Welsh and the other members of the Board by the General Counsel of Oxford House in his July 2013 letter. The McNeils proffered evidence that Welsh opposed and ignored the request and that he withheld it from the Association's attorney in derogation of his supposed duty as the Board's Secretary (though this may be one of the material facts in genuine dispute). Welsh's actions (or inaction) evidently delayed the Board's response to the request for months and contributed to the issuance of the cease-and-desist letter threatening the McNeils with legal action.

Thus, even though Welsh may not have had the power, as a single member of the Board of Directors, to decide whether the Association would grant or deny the requested accommodation, the McNeils proffered evidence that Welsh had and exercised the power to prevent a timely review and determination of the request.

---

[65] The precise rationale for the requested accommodation is not set forth in the record before us, but we understand the McNeils to contend that the accommodation is needed to enable the recovering alcoholics and drug addicts to take advantage of the group home residential opportunity and comply with the specific conditions of participation in the Oxford House recovery program. We express no opinion as to whether this is so.

"The failure to make a timely determination after meaningful review amounts to constructive denial of a requested accommodation, 'as an indeterminate delay has the same effect as an outright denial.'"[66] The fact that the Board eventually did consider the request and that the McNeils ultimately received the accommodation they sought does not mean Welsh cannot be found liable for the delay. "The Act is violated when a reasonable accommodation is first denied, regardless of remedial steps that may be taken later."[67] That Welsh was only a single member of the Board of Directors does not mean he cannot be held individually liable if, in that capacity or otherwise, he personally committed or contributed to a violation of the Fair Housing Act or the Human Rights Act.[68]

---

[66] *Bhogaita*, 765 F.3d at 1286 (quoting *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir. 2000)); *see also United States v. District of Columbia*, 538 F. Supp. 2d 211, 219 (D.D.C. 2008).

[67] *District of Columbia*, 538 F. Supp. 2d at 219 (citing *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 602 (4th Cir. 1997)).

[68] *See, e.g.*, *Chavez v. Aber*, 122 F. Supp. 3d 581, 593 (W.D. Tex. 2015) ("[C]ourts across the country have routinely imposed individual liability for discriminatory actions under the FHA.") (citing cases); *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1293 (S.D. Fla. 2014) ("Individual board members or agents such as property managers can be held liable when they have personally committed or contributed to a Fair Housing Act violation.") (internal quotation marks omitted); *Fielder v. Sterling Park Homeowners Ass'n*, 914 F. Supp. 2d 1222, 1229-30 (W.D. Wash. 2012) (holding that members of non-profit could be found individually liable under the FHA for race-based discrimination).

In addition, the McNeils proffered that Welsh violated the anti-retaliation provisions of the Fair Housing and Human Rights Acts by threatening them with and pursuing a lawsuit for violating the Bylaws of the Association despite their explanation that their tenants needed and were entitled to an accommodation. Even though Welsh may not have had the power as a single Board member to bind the Association, he clearly had and exercised the power to sue the McNeils. Such conduct can support a retaliation claim.[69]

---

[69] *See, e.g.*, *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743-44 (1983) (holding "that it is an enjoinable unfair labor practice to prosecute a baseless lawsuit with the intent of retaliating against an employee for the exercise of rights protected by § 7 of the NLRA[]"; "such suits are not within scope of First Amendment protection" and state interests in maintaining domestic peace and protecting citizens' health and welfare do not enter into play when suit has no reasonable basis.); *United Credit Bureau of Am., Inc. v. NLRB*, 643 F.2d 1017, 1025 (4th Cir. 1981) ("Likewise, the message to United's employees is clear: assertion of protected rights (rights found subsequently to be meritorious by the labor board) will subject you, as a United employee, to a retaliatory lawsuit and all the expense and trouble that goes with it. The violation of Section 8 (a)(1) is thus clear. We conclude that substantial evidence supports the Board's finding that United's lawsuit filed against its charging employee . . . constituted violations of Sections 8 (a)(4) and (1) of the Act."); *cf. Ayasli v. Armstrong*, 780 N.E.2d 926, 937 (Mass. App. Ct. 2002) ("The jury could have viewed the Armstrongs' conduct as constituting persistent efforts to disturb the plaintiffs' enjoyment of their land, to impede access, limit use, and generally make the Ayaslis so uncomfortable in that secluded location that they would abandon their plans for the house. Put another way, a reasonable person could have felt threatened and intimidated and feared that the Armstrongs would always try to interfere with their access to and enjoyment of their property, as the Ayaslis testified that they felt.").

Welsh may have meritorious factual or legal defenses to the McNeils' reasonable-accommodation and retaliation claims. We perceive that there may remain genuine disputes of material fact to be resolved, which would preclude an award of summary judgment on those claims to either side. But such questions are not before us at this stage and we express no views on them. It suffices to say that the sole rationale relied upon to grant summary judgment to Welsh does not support it.

BECKWITH, *Associate Judge*, with whom MCLEESE, *Associate Judge*, joins, concurring: The sole point of disagreement within the division concerns the disposition of Mr. Welsh's claims against the McNeils. The trial court granted summary judgment against Mr. Welsh on the theory that he lacked standing to assert these claims based on the HOA bylaws. Concluding that the grant of summary judgment cannot be sustained on this basis, we reverse.

"Standing is a question of law that is reviewed de novo; the underlying factual determinations are reviewed for clear error." *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 729 (D.C. 2011). The basis for Mr. Welsh's standing is Article XI, § 1 (d) of the HOA's bylaws, which states that "[a]ny individual

Member shall have the same rights as the Association to enforce any provision of these Bylaws except the right to collect delinquent assessments." Section 1 (a)(1) further provides that legal relief "may be sought by the Association . . . or, if appropriate, by any aggrieved Member." No other provision in the bylaws requires or allows the HOA to approve or disapprove suits by members to enforce the bylaws.

The trial court concluded that the HOA's purported approval of the McNeils' lease on March 27, 2014, deprived Mr. Welsh of standing to sue for the violation of the bylaws he has alleged. Even assuming that the HOA did approve the McNeils' third lease with Oxford House – Texas Avenue, however— something Mr. Welsh disputes—we do not agree with the trial court that this approval deprived Mr. Welsh of standing to assert his claims under the HOA bylaws, which are akin to a contract enforceable by all individual members. *See Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005) ("It is well established that the formal bylaws of an organization are to be construed as a contractual agreement between the organization and its members."). Just as the parties to a contract may provide for enforcement by an intended third-party beneficiary, *see, e.g.*, *Fields v. Tillerson*, 726 A.2d 670, 672 (D.C. 1999), the bylaws of an organization may also provide for enforcement by individual

members. No one contends that the relevant bylaw provisions changed during the course of the litigation. Assuming they initially conferred standing on Mr. Welsh—an assumption neither the trial court nor the parties have challenged—they continued to do so.[1]

If the HOA approved the McNeils' third lease and thereby brought it into compliance, Mr. Welsh's claim that this lease violated the bylaws may well fail on the merits. If the HOA itself were to sue the McNeils on similar grounds, its claim might fail for the same reason: not because the HOA or Mr. Welsh lacked standing to enforce the bylaws, but because the McNeils were no longer violating the bylaws. The absence of a violation—or the court's inability to grant relief due to the absence of a violation—cannot in itself deprive a party of standing. If it could, consideration of standing would lapse entirely into adjudication of the merits. *See Grayson v. AT&T Corp.*, 15 A.3d 219, 229 & n.20 (D.C. 2011).

In addition, the trial court's order granting summary judgment failed to take into account the McNeils' prior two leases, which were in effect from 2009 to 2011

---

[1] On remand, the parties may address the impact, if any, of the phrase "if appropriate" in the bylaw provision allowing legal relief to be sought, "if appropriate, by any aggrieved Member." This question has not been addressed by the trial court or raised by the parties, and we decline to decide it *sua sponte* and without the benefit of briefing.

and 2011 to 2013. The HOA purported to approve only the lease that began in 2013, so even if that approval did have some bearing on Mr. Welsh's standing, it did not affect his standing to sue based on the earlier noncomplying leases.[2]

Judge Glickman argues in dissent that the trial court was—or would have been, had it addressed this issue—justified in concluding that Mr. Welsh lacked standing to sue for these past violations of the bylaws because there was no relief the court could provide. On this record it appears that the past noncompliant leases left nothing to enjoin and there was therefore no basis for prospective relief. *See, e.g.*, *Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) (stating that the redressability condition of standing requires that "a plaintiff seeking forward-looking relief, such as an injunction, must allege facts showing that the injunction is necessary to prevent injury otherwise likely to happen in the future"). But Mr. Welsh has also persistently sought monetary damages—in his complaint, in his motion for summary judgment, and in his brief in this court.[3] A claim for damages

---

[2] At least before this court, the McNeils have not disputed that the earlier leases were in violation of the HOA bylaws.

[3] Although Mr. Welsh's claim for damages has persisted throughout the litigation, it has also changed. In his complaint, he asserted without elaboration that he and the HOA had both suffered damages. In his motion for summary judgment, on the other hand, he argued only that the HOA was entitled to damages based on a fine schedule promulgated under the bylaws. In his appellate brief, he

*(continued…)*

is not mooted by the lack of an ongoing violation or the unavailability of prospective relief. *See, e.g.*, *Vaughn v. United States*, 579 A.2d 170, 174 (D.C. 1990) (en banc). Mr. Welsh's live claim as it pertains to the prior leases is that the McNeils' violations of bylaws that he is empowered to enforce entitle him to damages, a remedy the court can grant. Regardless of the actual merits of this claim, Mr. Welsh is entitled to assert it and the trial court erred in concluding—at least on the grounds it relied on—that he lacked standing.

While the record before us might permit us to reach our own conclusions on the merits of Mr. Welsh's claims, "it usually will be neither prudent nor appropriate for this court to affirm summary judgment on a ground different from that relied upon by the trial court." *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 560 (D.C. 2001); *see also Jaiyeola v. District of Columbia*, 40 A.3d 356, 372-73 (D.C. 2012). The order granting summary judgment rested entirely on the erroneous conclusion that Mr. Welsh lacked standing due to the HOA's approval of the McNeils' 2013 lease, and the briefing in this appeal has focused on that issue. Arguments on other aspects of Mr. Welsh's standing or on the merits of Mr.

---

*(continued…)*
refers both to damages he has suffered and to the HOA's fine schedule. On remand the trial court may determine what damages Mr. Welsh is claiming and whether he is entitled to them.

Welsh's claims—for example, about whether the HOA actually approved the 2013 lease or whether Mr. Welsh has adequately shown an entitlement to damages based on the McNeils' prior noncompliant leases—can best be addressed by the trial court in the first instance. We therefore vacate the trial court's order granting summary judgment on Mr. Welsh's claims and remand for further proceedings consistent with this opinion.